**Jason R. SEARCY, as Trustee of the Exempt Assets Trust, Petitioner,[1]**

v.

**PAREX RESOURCES, INC., Respondent**

**Jason R. Searcy, as Trustee of the Exempt Assets Trust, Petitioner,**

v.

**Parex Resources (Bermuda), Ltd., Respondent**

No. 14–0293, No. 14–0295

Supreme Court of Texas.

Argued December 10, 2015

OPINION DELIVERED: June 17, 2016

Rehearing Denied September 23, 2016

1. This party is a bankruptcy trustee and successor to the claims of ERG Resources, LLC ("ERG")—the company that was originally before us, but which has since become insolvent. For convenience, we continue to refer to the trustee via its predecessor-in-interest's name ("ERG").

Jeffrey C. Kubin, Anthony N. Kaim, Angus Joseph Dodson, Michael R. Absmeier, Robin C. Gibbs, Gibbs & Bruns LLP, Houston TX; for Petitioner.

Amy C. Falcon, Eugene M. Nettles, Jim D. Aycock Jr., Lauren Beck Harris, Mark Harris Stamey, Richard Runions, Porter Hedges, L.L.P., Houston TX, O'Neill, Harriet, Law Office of Harriet O'Neill, PC, Austin TX, for Ramshorn Intrn'l Ltd.

Amy C. Falcon, Eugene M. Nettles, Jim D. Aycock Jr., Lauren Beck Harris, Mark Harris Stamey, Richard Runions, Porter Hedges, L.L.P., Houston TX, for Parex Resources, Inc.

JUSTICE WILLETT delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE LEHRMANN, and JUSTICE DEVINE joined.

This complicated jurisdiction case involves multiple corporations, countries, and continents.

Here is the SparkNotes summary. A Bermudian entity was the sole shareholder of Class A shares of another Bermudian entity that owns certain Colombian oil and gas operations. The Bermudian shareholder sought to sell these shares and entered into a share purchase agreement, negotiated in Texas, with a Texan entity. The deal fell through, and so the Bermudian shareholder searched for other buyers. After a Canadian entity pursued the shares, the Texan entity sued both the Canadian entity and the Bermudian shareholder in Texas for tortious interference with its share purchase agreement. The Texan entity also sued the Bermudian owner of the Colombian oil and gas operations in Texas for fraud.

We hold that when the Canadian entity sought to purchase shares of a Bermudian entity that owns Colombian assets from a Bermudian shareholder and did not intend to develop a Texas business, it did not purposefully avail itself of Texas's jurisdiction. The Canadian entity's contacts with Texas were too fortuitous and attenuated for the exercise of specific jurisdiction over the entity to be consistent with due process. Indeed, even considering the extent of the communications between the Canadian entity and the Bermudian shareholder's executives in Texas—communications that were certainly voluminous, and, as is usual these days, electronic—the Canadian entity had no control over where the employees of the Bermudian shareholder happened to be located. Moreover, the Canadian company did not desire to create an ongoing relationship with Texas, enjoy the benefits of our laws, or profit from our thriving economy. The Bermudian shareholder who owned shares related to the Colombian assets—and it does matter that those assets were Colombian, not Texan—could have employees located anywhere in the world; the location of its executives in Texas, and their corresponding communications with the Canadian entity, were totally fortuitous. This coincidence is insufficient to confer jurisdiction over the Canadian entity.

We also hold, however, that Texas courts have specific—although not general—jurisdiction over the Bermudian owner of the Colombian oil and gas operations. The claims against the Bermudian owner turn on its Texas-based executives' alleged misrepresentations in Texas to a Texas entity. These executives had the authority to sell the shares, and held themselves out as such over many years. Such entanglement with Texas is thus substantial enough to confer specific jurisdiction, and the trial court had sufficient evidence to so hold. But while this relationship between Texas and the claims alleging malfeasance stemming from the actions of the executives here, and of those to whom they gave marching orders, is relevant to the specific jurisdiction analysis, these contacts are in-

sufficient to confer general jurisdiction over the Bermudian owner.

We thus affirm judgment of the court of appeals.

## I. Factual Background.

Several corporate entities are involved in this case:

- ERG is a company based in Houston.[2]
- Parex Resources, Inc. ("Parex Canada") is a Canadian energy company that focuses on Latin American assets.

- Nabors Industries, Limited ("Nabors") is a Bermudian company with operations in Houston.

- Ramshorn International, Limited ("Ramshorn") is a Bermudian company that maintained oil and gas operations in Colombia. Nabors' subsidiary owned all the Class A shares of Ramshorn.

Nabors decided to divest its stake in Ramshorn, and requested bids for its Class A shares during Fall 2011. ERG expressed an interest in purchasing the shares. Claudia Arango, Ramshorn's general manager in Colombia, prepared a presentation about the company's operations there. The presentation indicated that Ramshorn had rights to explore a certain portion of the outer continental shelf off Colombia via the waters of the so-called "Jag–A block."

In early 2012, Edgar Dunne, ERG's Chief Operating Officer, and Jordan Smith, Nabors' Head of Global Explorations, went to Colombia where Ramshorn allegedly represented that it had a 95 percent interest in the Jag–A block, subject to approval by the Colombian government. Ramshorn allegedly claimed that it acquired this interest through an agreement

with a different company, Columbus Energy Limited ("Columbus").

Later in January 2012, Dunne and various colleagues from ERG attended a meeting with Nabors representatives in Houston. A Nabors attorney, Scott Peterson, allegedly claimed that Ramshorn had clean title to the Colombian operations, and that it controlled Columbus. ERG then sent Nabors a formal letter of intent dated February 17, 2012, offering to purchase the shares for $31.5 million. On the road to a deal, ERG continued to conduct due diligence, in part by reviewing documents in a virtual data room that was hosted by a Texas server. During the ongoing negotiations, Nabors' head of global exploration, Jordan Smith, made various representations about the Colombian assets; Nabors' due diligence materials identified him as

**2.** As noted above, we refer to Petitioner as "ERG" for convenience since ERG Resources, LLC was initially before the Court. That limited liability company has become bankrupt. The trustee of the bankruptcy estate, as reflected in this case's style, and who acts as the assignee of ERG's claims, is Jason R. Searcy.

Ramshorn's president; and Arango appeared to think him to be her boss. Smith was instrumental in Ramshorn's critical decision-making, and Arango was required to seek his permission for many large capital expenditures. Moreover, Smith was in charge of Nabors' divestment of shares like the Ramshorn shares, and worked with Arango to sell them.

But the deal's progress began to falter. Back in 2010, Nabors had publicly announced its desire to sell the Ramshorn shares, and had retained Royal Bank of Canada (RBC), which is, of course Canadian, as its financial adviser. Smith had then contacted a Calgary-based RBC employee, Bevin Wirzba, who worked on facilitating the prior sale which ultimately did not occur. Now fearing that the ERG transaction would not close, Smith again reached out to Wirzba, as Smith indicated in his deposition by ERG:

> Q: Okay. And did there come a later point in time in 2011 or 2012 when you went back to RBC and asked them if they could help you sell shares and associate in that sense?
>
> A: Yes. Once ERG had declined any interest in pursuing the project any further, I contacted Royal Bank of Canada and asked them if they wanted to go back to various of the companies that we had talked to in 2010 and see if they knew if they were interested in buying the shares . . . .

As a result of Smith's request that Wirzba to reinitiate contact with these prior putative buyers, RBC—aware that Parex Canada wanted to expand its Colombian portfolio—notified Parex Canada about Nabors' renewed desire to sell the shares:

> Q: Who were . . . the people that you wanted RBC to contact?
>
> A: The people that had been previously contacted during the 2010 effort to sell.
>
> Q: Well, who had—who were those—who were those people?
>
> A: Oh, gee whiz. I think that all told back in 2010 we had . . . probably contacted 50 companies.
>
> Q: Okay. Did it include Parex?
>
> A: Included Parex.

After being contacted by RBC, Parex Canada drafted a letter of intent, sent it to RBC, and thus formally engaged RBC to facilitate the deal. Wirzba then sent the letter to Nabors on behalf of Parex Colombia, which is wholly owned by one of Parex Canada's wholly owned subsidiaries, Parex Barbados. Parex Colombia has its own board of directors and corporate officers, distinct from those of Parex Canada. The purchase price was $40 million. Nabors and Parex Colombia entered into a confidentiality agreement after which Nabors gave Parex Colombia access to the data room. The confidentiality agreement included a Texas choice of law clause, but Parex Colombia requested that it be changed to New York instead.

Nabors then began entertaining multiple bids for the shares, and the purchase prices went higher and higher.[3] Although Parex Colombia was the named bidder, the bidding process was orchestrated by Parex Canada's executives. During the process, Parex Canada's executives exchanged numerous emails, calls, and voicemails with their Nabors counterparts. The Parex Canada executives knew that the Nabors executives worked in Texas.

Eventually, on March 9, 2012, Nabors arranged for its Bermudian subsidiary,

---

**3.** Parex Colombia upped its bid price sequentially from $40 million, to $50 million, to $55 million, to $75 million. Meanwhile ERG increased its offers from $30 million, to $39 million, to $45 million.

Nabors Global Holdings II, Limited (Nabors Global), to enter into a share purchase agreement with ERG (ERG SPA). Under the terms of the agreement, ERG agreed to pay $45 million for the shares, with the deal set to close at 9 a.m. on March 15. ERG provided $3 million to be held in escrow. Nabors did not make Ramshorn a party to the ERG SPA, but it continued to provide ERG with diligence materials. On the day the ERG SPA was executed, Nabors emailed Wirzba to tell him that it had found another purchaser, but did not name ERG or expressly mention the ERG SPA. Nonetheless, Nabors continued to keep its data room open for other bidders to access the diligence materials. It was after this that Parex Colombia increased its bid to $55 million. Wirzba told Parex Canada that "if there is a hiccup in closing ... you'll be the first to know." After this, Parex Canada and Nabors remained in contact concerning seismic data relating to the Ramshorn properties.

ERG and Nabors Global failed to close their deal on time. Pursuant to Wirzba's assurances that "[they'd] be the first to know" if the deal fell through, Parex Canada executives thereafter inquired as to the status of the shares, interested—as they had been for a few years—in acquiring Colombian oil and gas assets. This is when Parex Colombia again increased its bid, this time to $75 million. On March 16, 2012, however, ERG and Nabors Global agreed to extend their closing date by 72 hours. Nabors informed Parex Canada that it was working out an extension to the closing date, and included a draft of a proposed share purchase agreement with Parex Colombia in this communication.

But the second attempt to close failed as well. During the final diligence phase, ERG allegedly learned that Ramshorn had made financial misrepresentations about

the nature of its ownership in the Jag–A block. As a result, the deal failed to close for a second time. Nabors notified a Parex Canada executive that its deal had failed, and so Parex Colombia renewed its $75 million offer, and negotiations began.

ERG filed this suit in Texas seeking specific performance of the ERG SPA, and alleging tortious interference with contract against Nabors Global and Parex Canada. ERG also sought a temporary restraining order that would bar the sale of the Ramshorn shares. The trial court denied the request, and so ERG filed suit in Bermuda. The Bermudian court temporarily enjoined the sale of the shares while Nabors was not yet before the court, but lifted the restraining order after Nabors appeared.

The parties dispute when exactly Parex Canada's executives came to know about the ERG SPA. Parex Canada claims this occurred only at the point when it was sued in Texas. However, ERG contends that Nabors' email to Wirzba, sent after the ERG SPA was signed, conveyed the existence of the contract because the email used the word "deal."

In any event, Parex Canada arranged for Parex Barbados to wholly own a new Bermudian entity that was created in order to acquire the shares: Parex Bermuda. On April 12, 2012, the same day on which Parex Bermuda was created, Nabors Global and Parex Bermuda duly executed a share purchase agreement (Parex Bermuda SPA). The agreement was signed in Bermuda by Bermudian residents using funds located in Bermuda. Parex Canada acted as guarantor for the amount that Parex Bermuda was to pay. The Parex Bermuda SPA and the guarantee both contained New York forum selection and choice of law clauses.

ERG subsequently sued Parex Bermuda for tortious interference with contract, and also sued Ramshorn for fraud. Parex

Canada, Parex Bermuda, and Ramshorn filed special appearances contesting the trial court's jurisdiction over them.

The trial court concluded that it had personal jurisdiction over Parex Canada and Ramshorn, but not over Parex Bermuda. The court of appeals reversed as to Parex Canada, noting that it is undisputed that Smith initiated contact with RBC, but sustained the trial court's judgment with respect to Parex Bermuda and Ramshorn.

Both ERG and Ramshorn now appeal to this Court for reversal. ERG contends that Texas courts have specific jurisdiction over Parex Canada and Parex Bermuda. Ramshorn, meanwhile, argues that Texas courts have no jurisdiction over it.

The court of appeals got it right. Texas courts have jurisdiction over Ramshorn, but not over Parex Canada and Parex Bermuda.

## II. The Constitutional Contours of Personal Jurisdiction in Texas

■ The jurisdictional issue in this case presents a question of law, and we review a trial court's decision on special appearances *de novo*.[4] The plaintiff bears the initial burden of pleading allegations that suffice to permit a court's exercise of personal jurisdiction over the nonresident defendant.[5] Once the plaintiff has met this burden, the defendant then assumes the burden of negating all potential bases for personal jurisdiction that exist in the plaintiff's pleadings.[6]

■ The exercise of personal jurisdiction in Texas state courts turns on both federal and state law. Courts have personal jurisdiction over a defendant when two criteria are satisfied: (1) the Texas long arm statute must grant jurisdiction;[7] and (2) the exercise of jurisdiction must comport with federal and state constitutional guarantees of due process.[8] The Texas long arm statute provides for personal jurisdiction that extends to the limits of the United States Constitution, and so federal due process requirements shape the contours of Texas courts' jurisdictional reach.[9]

■ "The Due Process Clause of the Fourteenth Amendment constrains a [s]tate's authority to bind a nonresident defendant to a judgment of its courts."[10] Under the jurisprudential lodestar for personal jurisdiction, *International Shoe Company v. Washington*,[11] whether a trial court's exercise of jurisdiction is consistent with due process requirements turns on two requirements: (1) the defendant must have established minimum contacts with the forum state; and (2) the assertion of jurisdiction cannot offend traditional notions of fair play and substantial justice.[12] As relevant to our analysis in this case,

---

4. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex.2002).

5. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex.2009).

6. *Id.*; *see also BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex.2002).

7. *See, e.g., Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex.2007).

8. *Id.*

9. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991).

10. *Walden v. Fiore*, —— U.S. ——, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014).

11. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

12. *Id.* at 316, 66 S.Ct. 154 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).

sufficient minimum contacts exist when the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." [13] The nub of the purposeful availment analysis is whether a nonresident defendant's conduct in and connection with Texas are such that it could reasonably anticipate being haled into court here. Purposeful availment involves contacts that the defendant "purposefully directed" into the forum state.[14]

*International Shoe* provides two strains of personal jurisdiction: specific and general. Because both strains are at issue in this case, we provide an overview of the governing jurisprudence as to each.

## A. Specific Jurisdiction: Contacts Out of Which the Cause of Action Arises

The first type of personal jurisdiction is specific jurisdiction, which is based on whether the defendant's activities in the forum state themselves "give rise to the liabilities sued on." [15] Broadly stated, specific jurisdiction exists when the plaintiff's claims "arise out of" or are "related to" the defendant's contact with the forum." [16]

In *Shaffer v. Heitner*,[17] and on several occasions since, the United States Supreme Court has emphasized that the *defendant's* relationship, not the *plaintiff's* relationship, with the forum state is the proper focus of the specific jurisdiction analysis; that is, courts must consider the relationship between the defendant, the forum state, and the litigation.[18] As we explained in *Michiana Easy Livin' Country, Inc. v. Holten*,[19] there are three features of the "purposeful availment" inquiry as applied to specific personal jurisdiction: [20] (1) the relevant contacts are those of the defendant, and the unilateral activity of another person or a third party is not pertinent; [21] (2) the contacts that establish purposeful availment must be purposeful rather than random, fortuitous, isolated, or attenuated; [22] and (3) the defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction.[23] In the same vein, the "minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number." [24] Thus, "the mere

---

13. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (citations omitted); *see also Montcrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d at 150 (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex.2009)).

14. *Guardian Royal*, 815 S.W.2d at 228.

15. *Int'l Shoe*, 326 U.S. at 317, 66 S.Ct. 154.

16. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn. 8, 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *see also Michiana*, 168 S.W.3d at 795.

17. 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

18. *Id.* at 204, 97 S.Ct. 2569; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *Walden v. Fiore*,

—— U.S. ——, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014).

19. 168 S.W.3d 777 (Tex.2005).

20. *Id.* at 785.

21. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

22. *Id.*; *Keeton*, 465 U.S. at 774, 104 S.Ct. 1473.

23. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex.2005) (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

24. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 339 (Tex.2009).

fact that [a defendant's] conduct affected plaintiffs with connections to the forum [s]tate does not suffice to authorize jurisdiction."[25] The happenstance of a plaintiff's connection to Texas, then, will not alone suffice to confer specific jurisdiction over a defendant who merely deals with a Texas resident during the course of some unrelated endeavor. As a result, a defendant may structure its transactions in such a way as "neither to profit from the forum's laws nor subject itself to jurisdiction" there, which we have termed "purposeful[ ] avoid[ance]."[26]

 Applying these principles, the Supreme Court has held that where a publisher contemplates a forum state as the locus of its printed material and any defamatory harm it causes—seeking to profit from extensively circulating several million copies of its magazine there—there is specific jurisdiction.[27] This was the case in *Calder*, where the fallout from allegedly defamatory statements involved was tied to the state in which the magazine had its largest circulation.[28] Similarly, where a defendant publisher circulates tens of thousands of copies of its magazine in a particular state, the plaintiff's *lack* of residence in that state is insufficient to defeat jurisdiction over the defendant in a defamation suit.[29] The Supreme Court emphasized this point in *Keeton*, holding that the magazine publisher could be haled into court in a state where it looked to profit from distributing large numbers of its magazine, the content of which harmed a nonresident plaintiff's reputation.[30] In other words, where the defendant has "continuously and deliberately exploited the [forum state's] *market*," specific jurisdiction exists.[31]

Outside of the defamation context, we held in *Michiana* that where a buyer reaches out to a foreign seller that does not do business in Texas, and fully agrees to resolve all disputes arising out of the agreement in a different state, the mere fact that the buyer brings the allegedly problematic product back to Texas is insufficient to confer specific jurisdiction over the seller in Texas.[32] The Court applied the three principles—that the defendant's contacts are the ones that matter, that contacts must be purposeful, and not random, isolated, or fortuitous, and that the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction—in so holding.[33] The Court also found unpersuasive the argument that the seller had somehow "directed" a tort into Texas by communicating on the phone with a Texas resident.[34]

As it turns out, we interpreted *Calder* the same way the Supreme Court recently did in *Walden*: Mere knowledge that the "brunt" of the alleged harm would be felt—or have effects—in the forum state is

**25.** *Walden v. Fiore*, —— U.S. ——, 134 S.Ct. 1115, 1126, 188 L.Ed.2d 12 (2014).

**26.** *Michiana*, 168 S.W.3d at 785 (citing *Burger King*, 471 U.S. at 472, 105 S.Ct. 2174).

**27.** *Calder v. Jones*, 465 U.S. 783, 785–86, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

**28.** *Id.*

**29.** *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

**30.** *Id.* at 776–77, 104 S.Ct. 1473.

**31.** *Id.* at 781, 104 S.Ct. 1473 (emphasis added).

**32.** *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 781–84 (Tex.2005).

**33.** *Id.* at 785.

**34.** *Id.* at 788.

insufficient to confer specific jurisdiction.[35] In *Calder*, the circulation of the defendant's article was enough to create a substantial "presence" in the forum state.[36] The seller in *Michiana*, like the law enforcement officer in *Walden*, had no no such link to Texas.[37] The *Michiana* court thus expressly rejected the "directed-a-tort" theory from the jurisprudence surrounding specific jurisdiction.[38] Even if a nonresident defendant *knows* that the effects of its actions will be felt by a resident plaintiff, that knowledge alone is insufficient to confer personal jurisdiction over the nonresident. Indeed, in *Walden*, Justice Thomas made a similar point for a unanimous Court:

> [T]he Court of Appeals looked to [the defendant officer's] knowledge of [the plaintiff gamblers'] strong forum connections. In the court's view, that knowledge, combined with its conclusion that [the gamblers] suffered foreseeable harm in Nevada, satisfied the "minimum contacts" inquiry. This approach to the "minimum contacts" analysis impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis. [The officer's] actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plain-

tiffs whom he knew had Nevada connections. Such reasoning improperly attributes a plaintiff's forum connections to the defendant and makes those connections decisive in the jurisdictional analysis.... Relying on *Calder*, [the gamblers] emphasize that they suffered the "injury" caused by [the officer's] allegedly tortious conduct (*i.e.*, the delayed return of their gambling funds) while they were residing in the forum. This emphasis is likewise misplaced.[39]

For the same reasons, we held that a Utah tour operator, about which a Texan learned via word of mouth from a Texan third party, cannot be haled into Texas court on the basis of just *alleging* the tour operator's liability for a death that occurred in Arizona.[40] The *Moki Mac* Court reviewed various options for analyzing the relatedness between a nonresident's contacts and the litigation itself.[41] We considered "but-for" relatedness and criticized that analysis as being "too broad and conceptually unlimited in scope."[42] A proximate cause standard on the other hand presented "too narrow an inquiry."[43] A sliding scale that involved examining the relationship between forum contacts and the litigation was problematic because it severs the archetypal framework of there being two distinct kinds of personal juris-

---

**35.** *See Walden v. Fiore*, —— U.S. ——, 134 S.Ct. 1115, 1123, 188 L.Ed.2d 12 (2014); *cf. Michiana*, 168 S.W.3d at 788 (rejecting the proposition that "[i]f a tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum state, he must reasonably anticipate being haled into court there to answer for his actions").

**36.** *Walden*, 134 S.Ct. at 1121.

**37.** *Michiana, Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 789 (Tex.2005); *Walden*, 134 S.Ct. at 1124.

**38.** *Michiana*, 168 S.W.3d at 789–90.

**39.** *Walden*, 134 S.Ct. at 1124–25 (citations omitted).

**40.** *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 588 (Tex.2007). The dissent relies on this defunct theory, as we note, making the validity of jurisdiction turn on the merits of a tortious interference claim.

**41.** *Id.* at 580–585.

**42.** *Id.* at 585.

**43.** *Id.*

diction, specific and general.[44] In the end, we adopted the requirement that we laid out in *Guardian Royal.* "[F]or a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation."[45] Therefore, because in *Moki Mac* the tour operator's advertising brochures and release, which it sent to Texas, were not substantially connected to the operative facts of the litigation—alleged events which occurred during the Arizona trip—the Texas court did not have specific jurisdiction over the tour operator.[46] The United States Supreme Court has since clarified that the due process constraints on specific jurisdiction do indeed require this kind of *"substantial* connection," a concept that the Court emphasized in *Walden.*[47]

■ Specific jurisdiction, in short, does not turn on where a plaintiff happens to be, and does not exist where the defendant's contacts with the forum state are not substantially connected to the alleged operative facts of the case. There is no debate on these points, as the Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."[48]

■ The dissent broadly states that "if a nonresident defendant's purposeful activities within Texas are the crux of the tort claim, Texas courts have jurisdiction" over that tort claim.[49] But the Supreme Court has made clear that the nature of a plaintiff's claim does not by itself control whether courts have specific jurisdiction over the defendants against which the claims are levied. In *Calder,* the Court emphasized the magazine's "large circulation" in California,"[50] and noted that "[a]bout 600,000 ... copies, almost twice the level of the next highest State, [were] sold in California."[51] The Court also observed that the article in question was "drawn from California sources, and [that] the brunt of the harm, in terms both of ... emotional distress and the injury to ... professional reputation, was suffered in California."[52] Indeed, "in sum, California [was] the focal point both of the story and of the harm suffered."[53] As we noted in *Michiana,* we must not confuse "the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits."[54] *Calder* emphasized that "[to] reintroduce those concerns at the jurisdictional stage would be a form of double count-

---

44. *Id.*

45. *Moki Mac,* 221 S.W.3d at 588 (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 229–33 (Tex.1991)).

46. *Id.* at 585.

47. *Walden v. Fiore,* — U.S. ——, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014) ("[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State") (emphasis added).

48. *Id.* at 1122.

49. *Post* at 82. *See also* "[i]mportantly, Parex Canada's negotiation and bidding activities in Texas ... form the basis of ERG's tortious-interference claims." *Id.*

50. 465 U.S. 783, 784, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

51. *Id.* at 785, 104 S.Ct. 1482.

52. *Id.* at 788–89, 104 S.Ct. 1482.

53. *Id.* at 789, 104 S.Ct. 1482.

54. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 790 (Tex.2005).

ing."[55] And there, the "crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff."[56] The crux was not the nature of the claim. Undaunted, the dissent focuses on the merits of the underlying cause of action in its jurisdictional test and ultimately concludes that merely stating a claim that at its "crux" implicates Texas is sufficient to confer jurisdiction. We have rejected this jurisdictional theory.[57] As we made clear in *Michiana*:

> Business contacts are generally a matter of physical fact, while tort liability ... turns on what the parties thought, said, or intended. Far better that judges should limit their jurisdictional decisions to the former rather than involving themselves in trying the latter.[58]

What we said then remains good law and binds us today.

## B. General Jurisdiction: Contacts So Continuous and Systematic that a Defendant is "Essentially at Home"

*International Shoe* also contemplates suits where a defendant's "continuous ... operations within a state [are] thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities."[59] This is general jurisdiction and has been less frequently discussed, both by the Supreme Court and this Court, than its specific counterpart.[60]

One of the earliest Supreme Court cases, *Perkins v. Benguet Consolidated Mining Company*,[61] involved a Philippines corporate defendant whose president moved to Ohio after Japan invaded the Philippines during World War II.[62] The Court held that general jurisdiction over Benguet was proper in Perkins' suit, even though no claims related to any of Benguet's Ohio conduct.[63] The Supreme Court critically relied on Benguet's president's maintenance of the company's files in Ohio and oversight of the business from that state,[64] which led to the Court's later clarification that the touchstone of the *Perkins* analysis was that Benguet's principal place of business was in Ohio.[65]

A subsequent case, *Helicopteros v. Hall*,[66] concerned general jurisdiction over a Colombian corporation that went to Houston for a meeting, drew money from a New York bank through Texas, bought helicopter-related equipment from a Texan company, and sent personnel to be trained

55. *Calder v. Jones*, 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

56. *Walden v. Fiore*, — U.S. —, 134 S.Ct. 1115, 1123–24, 188 L.Ed.2d 12 (2014).

57. *Michiana*, 168 S.W.3d at 790.

58. *Id.*

59. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

60. *See, e.g.*, Mary Twitchell, *The Myth of General Jurisdiction*, 101 HARV. L. REV. 610, 628 (1988) (noting that "specific jurisdiction has become the centerpiece of modern jurisdiction theory, while general jurisdiction plays a reduced role").

61. 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

62. *Id.* at 448, 72 S.Ct. 413.

63. *Id.*

64. *Id.*

65. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 n. 11, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

66. 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

in Texas.[67] As in *Perkins*, the claims in *Helicopteros* were unrelated to the corporation's contacts with Texas; the claims instead related to a helicopter accident in Peru.[68] The Supreme Court held that corporation's contacts, even though some were periodically made, were insufficient to confer general jurisdiction over it.[69]

With these cases as a backdrop, we are mindful of the critical distinction between specific and general jurisdiction. Although the likelihood of specific jurisdiction may increase in step with any substantial connection between the asserted claims and the forum state, the ties between the litigation itself and the forum state are irrelevant to the question of whether general jurisdiction exists. Rather, general jurisdiction relies on the defendant itself being tied up—almost entangled in a web—with the forum state.[70] Thus, subsidiaries that are totally unrelated to the forum state, its economy, and its laws, cannot be haled into that state's courts merely by virtue of their ownership, and their ownership alone.[71]

And more recent Supreme Court cases have clarified that the general jurisdiction analysis entails a high bar. Indeed, a court has general jurisdiction over a defendant only if its "affiliations with the [s]tate are so continuous and systematic as to render it *essentially at home* in the forum [s]tate."[72] Continuous and systematic contacts that fail to rise to this

relatively high level are insufficient to confer general jurisdiction over a nonresident defendant.[73] Thus, when a nonresident corporation owns an in-state subsidiary, this ownership is not *ipso facto* sufficient to confer jurisdiction over the nonresident owner itself.[74] Courts do not have general jurisdiction over corporate defendants that are neither incorporated in the forum state nor have their principal place of business there, absent some relatively substantial contacts with the forum state.[75]

\* \* \*

Having laid out the pertinent law, we now apply it to the facts of this case.

### III. Application of Personal Jurisdiction Principles

#### A. No General Jurisdiction over Parex Canada

We begin with general jurisdiction over Parex Canada and deal with it summarily, given the relatively extreme lack of connection between Parex Canada and Texas. It is plain, as the court of appeals held, that Texas courts do not have general jurisdiction over Parex Canada.

*Daimler* makes clear that general jurisdiction is only present when a defendant not only has continuous and systematic contacts with the forum state, but also has these kinds of contacts to such an extent that they render it essentially at

---

67. *Id.* at 416, 104 S.Ct. 1868.

68. *Id.* at 410, 104 S.Ct. 1868.

69. *Id.* at 418, 104 S.Ct. 1868.

70. *See, e.g., International Shoe Co. v. Washington*, 326 U.S. 310, 318, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

71. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 131 S.Ct. 2846, 2850, 180 L.Ed.2d 796 (2011).

72. *Daimler AG v. Bauman*, —— U.S. ——, 134 S.Ct. 746, 761, 187 L.Ed.2d 624 (2014) (citing *Goodyear Dunlop Tires Operations, SA. v. Brown*, 564 U.S. 915, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011)) (emphasis added).

73. *Id.*

74. *Id.* at 759.

75. *Id.* at 761–62.

home in that state.[76] The general jurisdiction inquiry, as applied to a corporate defendant, is not limited to simply whether its principal place of business is the forum state, or whether the forum state is its state of incorporation.[77] That is, continuous and systematic contacts, taken alone, are not enough to confer general jurisdiction over a defendant—such a formulation of the test is "unacceptably grasping." [78]

 Here, we take heed of the trial court's finding that Parex Canada has no bank accounts, offices, property, employees, or agents in Texas. It does not sell products in Texas, nor does it pay taxes here. Aside from a few meetings concerning transactions unrelated to this case, Parex Canada has not interacted with Texas aside from in its dealings with Nabors. Its contacts with Texas are not even continuous and systematic, let alone sufficient to deem it essentially at home in Texas. There is no general jurisdiction over Parex Canada, and we affirm the court of appeals on this issue.

## B. No Specific Jurisdiction over Parex Canada

 We turn next to whether there is specific jurisdiction over Parex Canada. As relevant here, Jordan Smith, a Nabors employee, contacted RBC looking to sell off its shares related to oil and gas assets in Colombia. Parex Canada—striving to expand its Colombian portfolio—only became involved with Nabors after this solicitation.[79] Parex Canada appears to have known that Nabors had operations in Tex-

as, but it did not specifically seek out a Texas seller or Texas assets, let alone attempting to meddle with a contract governed by Texas law or develop a Texas business. In light of Nabors' coincidental presence in Texas, the fortuitous and attenuated nature of Parex Canada's contacts with Texas, and Parex Canada's lack of any desire to launch or maintain operations in Texas, we hold that the trial court lacked specific jurisdiction over Parex Canada.

The fact that Parex Canada knew that Nabors had operations in Houston is, taken alone, insufficient to confer specific jurisdiction. True, the trial court did find that Parex Canada employees arranged discussions with their Nabors counterparts that were to take place during calls described as "10am Houston or 10:30 Houston" time. Further, Parex Canada's executives knew that the virtual data room was housed in a Houston server, received emails from Nabors employees that contained their Texas addresses, and sent letters of intent to Nabors at a Houston address. ERG, of whom Parex Canada did not know until relatively late in its negotiations, turned out to be incorporated and headquartered in Texas.

But the mere fact that Nabors and ERG were both located in Texas and negotiated a multi-million-dollar acquisition at hand cannot be a decisive factor in the analysis of whether specific jurisdiction exists as to nonresident Parex Canada. As the Supreme Court noted in *Calder*, the "mere fact that the [publisher] could 'foresee'

---

76. *Id.* at 760.

77. *Daimler AG v. Bauman*, —— U.S. ——, 134 S.Ct. 746, 760, 187 L.Ed.2d 624 (2014).

78. *Id.*

79. The dissent attempts to refute the Court's position by noting that Parex Canada communicated with RBC. We cannot see how a Canadian company's communication with a Canadian bank's Calgary-based employee regarding the purchase of some Colombian oil and gas assets can provide the basis for specific jurisdiction over the Canadian firm in this State.

that the article [would] be circulated and have an effect in California [was] not sufficient for an assertion of jurisdiction." [80] Rather, in that case "the defendants' intentional tort actually occurred *in* California." [81]

▮ In the same vein, jurisdiction is proper when a defendant has "envisioned continuing and wide-reaching contacts" in the forum state.[82] Thus, it is important to note that Parex Canada did not seek to launch operations in Texas or reap the benefits of the Texas economy.[83] It was, instead, on the hunt for Colombian assets, and Ramshorn—a Bermuda company—owned some. ERG claims that "Parex Canada's contacts with Texas . . . began on Friday, March 9, 2012—the date on which Nabors and ERG entered into the $45 million ERG SPA." But Nabors' unilateral decision to enter into this agreement was completely out of Parex Canada's control. A plaintiff's (ERG's) decision to enter into a contract with a Texas company cannot provide the basis for specific jurisdiction over the defendant, (Parex Canada)—the plaintiff's engagement with a Texan party cannot alone provide a basis for jurisdiction over a foreign company that that wants to buy foreign assets.

Parex Canada did—as the dissent states—have many interactions with Nabors. The dissent implies that we make light of these communications because they did not occur in-person, but were rather made electronically via emails and calls.[84] Indeed, the dissent contends that the Court disregards "the realities of modern communications"[85] and "the realities of modern communication of complex business negotiations."[86] We do not, however, make such a distinction.[87] We agree with the dissent—Parex Canada's executives discussed the deal on multiple occasions with people whom they knew worked in Nabors' Texas operation. But that fact alone simply does not decide this case. As noted above, the "minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number."[88] It is natural that a transaction which involves the transfer of rights to an oil field will involve more extensive discourse than the sale of a motor vehicle that was involved in *Michiana*.

But, quantity aside, the quality and nature of the communications fail to establish purposeful availment. Discussions that focused on acquiring some non-Texan assets are a far cry from purposeful availment of Texas's jurisdiction—the Nabors employees involved could, quite literally, have

**80.** *Calder v. Jones,* 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

**81.** *Walden v. Fiore,* —— U.S. ——, 134 S.Ct. 1115, 1124, 188 L.Ed.2d 12 (2014).

**82.** *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

**83.** *See, e.g., Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (2005) (highlighting that "a nonresident that directs marketing efforts to Texas in the hope of soliciting sales is subject to suit here in dis-

putes arising from that business," but that without the intention to profit from the vibrant Texan economy, specific jurisdiction does not properly vest).

**84.** *Post* at. 76.

**85.** *Id.*

**86.** *Id.*

**87.** Indeed, nowhere in this opinion do we highlight a difference between in-person and electronic communications.

**88.** *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 339 (Tex.2009).

been based anywhere in the world, and Parex Canada would presumably have interacted with it in the same way as they did with its employees here. Parex Canada did not purposefully avail itself of the benefits, privileges, or profits of engaging with Texas. Rather, the mere coincidence of Nabor's presence here—completely out of Parex Canada's control—means that the trial court lacked specific jurisdiction.

Our caselaw confirms as much. We held in *Retamco* that even when a defendant does not enter Texas, its acceptance of Texas interests that are allegedly implicated in fraud is sufficient to confer specific jurisdiction, in part because such acceptance creates an ongoing relationship with Texas.[89] Similarly, in *Moncrief* we noted that the defendants were interested in establishing a long-term joint venture in Texas, and that fact was critical to our holding that they had purposeful and substantial contacts with Texas.[90] Similarly, we recognized in *Moki Mac* that when a defendant has aimed to "get extensive business in or from" Texas, it is more likely to have purposefully availed itself of the Lone Star State's jurisdiction.[91] As the Supreme Court held in *Calder*, jurisdiction was present when "intentional, and allegedly tortious conduct ... [is] *expressly aimed* at California."[92] There, as the Court went out of its way to state, the defendant publisher knew that the brunt of the injury would be felt where the magazine had "its largest circulation"[93]—the

publisher sought to sell its salacious story to readers that lived in the state in which it was subsequently sued.

Not so here. Parex Canada displayed no interest in developing a Texas enterprise, nor did it specifically seek a Texas seller. To the contrary, Parex Canada appears to have purposefully avoided Texas. It structured the transaction so as to neither benefit from Texas law nor subject itself to Texas courts' jurisdiction. Moreover, the Parex Canada guarantee contained a New York forum selection clause, and so did the Parex Bermuda SPA. Those agreements also contained New York choice of law clauses. As we said in *Michiana*, "insertion of a clause designating a foreign forum suggests that no local availment was intended."[94] And even more probatively, Parex Canada arranged for a Bermudian subsidiary to be the sole owner of the shares relating to Colombian assets. We are thus hard put to discern purposeful availment of Texas law or how Parex Canada "would have conducted its activities any differently if Texas had no law at all."[95]

The dissent states that if the assets were located in Midland, rather than Colombia, it would not alter the jurisdictional analysis.[96] We struggle to understand this logic. If the assets were located in Midland, Parex Canada would have been seeking to buy Texan operations and develop a

**89.** *Id.*

**90.** *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 153–54 (Tex.2013).

**91.** *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 578 (Tex.2007).

**92.** *Calder v. Jones*, 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (emphasis added).

**93.** *Id.* at 790, 104 S.Ct. 1482.

**94.** *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 792 (Tex.2005). Indeed, as the dissent itself notes, the agreement that was to be the starting point for negotiations contained a New York choice of law provision and specified Bermuda as the closing location.

**95.** *Id.* at 787.

**96.** Post at 90.

link with the Texas market from which it could profit. Those facts are materially different from the ones here. Parex Canada wanted to profit from a Colombian, not Texan, oil business—the two are certainly not interchangeable when it comes to whether jurisdiction is proper in Texas courts.

Parex Canada also did not initiate the interactions that it eventually had with Nabors. It was Nabors who solicited RBC for its investment banking services in order to find potential buyers of its shares. We view Parex Canada's emails and calls to Nabors in light of the fact that Nabors reached out to RBC, which in turn notified Parex Canada of the opportunity to acquire shares regarding Colombian assets— assets owned by Ramshorn, a Bermudian company. Parex Canada did not find out that ERG was a potential counterparty to Nabors Global for purchase of the relevant assets until a relatively late stage in the deal. Thus, Parex Canada did not have a "substantial connection" to the operative facts of the litigation.

ERG though claims that Parex Canada through its dealings with Nabors attempted to harm ERG in Texas, and wanted to induce breach of the ERG SPA. The merits of these claims, as we note above, are not at issue here. ERG's position is foreclosed by *Michiana*—the alleged direction of a tort into Texas is not a valid basis for specific jurisdiction. As we have highlighted in both *Michiana* and *Moncrief* and as the Supreme Court emphasized in *Walden,* the proper focus is on the quality of the defendant's contacts with the forum, as opposed to the residence of the plaintiff.

Indeed in *Moncrief* the defendants allegedly urged, in California, a Californian entity to breach its agreement with a Texas-based plaintiff—there was even an express allusion to the plaintiff that would eventually sue.[97] Yet we held that this sort of nonresident behavior by a nonresident defendant does not rise to the level of creating a substantial connection to the Texas forum.[98] Parex Canada merely sought to purchase assets in Colombia from a Bermudian entity, which would have the corollary of making it impossible for a Texas company to simultaneously own them. Such behavior is insufficient to confer upon Texas courts specific jurisdiction over Parex Canada.

In concluding that there is specific jurisdiction over Parex Canada, the dissent focuses on the number of emails, calls, and voicemails that the Canadian executives exchanged with people they *knew* worked for Nabors' Texas operation.[99] But in *Walden* the Supreme Court rejected the idea that simply because a defendant knows the effects of his actions will affect someone who lives in a state, there is specific jurisdiction over the defendant in that state.[100] Rather, the question before us is whether Parex Canada's communications with Texas, however voluminous, constitute purposeful availment. We hold that they do not. This case is not about the volume of communications between Parex Canada and Nabors. What instead controls is the fact that the Colombian oil and gas assets that Parex Canada wanted to buy happened to be owned by a Bermudian company which had some Texas oper-

---

97. *Moncrief Oil Int'l Inc. v. OAO Gazprom,* 414 S.W.3d 142, 156–57 (Tex.2013).

98. *Id.* at 158.

99. *Post* at 80.

100. The officer in that case seized cash from gamblers on their return trip to Nevada, and he knew that his allegedly false affidavit would affect people who lived in Nevada. *Walden v. Fiore,* —— U.S. ——, 134 S.Ct. 1115, 1124–25, 188 L.Ed.2d 12 (2014).

ations. It is hard to fathom a more "fortuitous" connection to Texas than the mere accident of a Bermudian firm, who turned out to own such Colombian assets, having some Houstonian executives involved in the sale.

We therefore affirm the court of appeals on this issue. The trial court erred in holding that it had specific jurisdiction over Parex Canada.

## C. Specific Jurisdiction over Ramshorn

 We agree with the trial court, the court of appeals, and the dissent, that the trial court had specific jurisdiction over Ramshorn. Ramshorn is a Bermuda corporation solely owned by Nabors, a Bermuda company that directs Ramshorn's actions from Houston. A Nabors executive, Jordan Smith, is also president of Ramshorn Investments, Inc. (Ramshorn Investments) which is a company separate from Ramshorn. Smith's responsibilities included supervising Nabors' mergers, acquisitions, and divestitures. One of ERG's allegations is that Smith acted and held himself out as Ramshorn's president, and in doing so made fraudulent representations in Houston about the Ramshorn assets that he was trying to sell to ERG. We affirm the denial of Ramshorn's special appearance, because Smith had actual and apparent authority to sell the Ramshorn shares, and because Smith actively negotiated their sale in Texas.

The trial court found that Smith acted as Ramshorn's president, even signing the company's drilling contracts. Ramshorn's general manager, Arango, stated that she believed Smith to be the president of Ramshorn as well as of Ramshorn Investments. Smith was the executive who signed off on "authorizations for expenditure" (ATEs), which Arango routinely sent him before Ramshorn spent large sums of money during the course of operations.

Moreover, Ramshorn's argument that the ATEs were simply creatures of Nabors' and its subsidiaries' accounting systems is unpersuasive. Rather, Arango referred to Smith as Ramshorn's president in draft materials that she sent him, and he merely forwarded these to Dunne without changing that representation. Such entanglement between Ramshorn and Nabors supports the trial court's holding that it had specific jurisdiction over claims alleging misrepresentation by the Nabors executive who had the actual power to control whether Nabors sells the Ramshorn shares—claims which arise out of the exercise of that power. This sort of close connection between Ramshorn and Nabors is not random, fortuitous, or attenuated—rather it was all part of a general plan to sell the Ramshorn shares via talks in Texas, and thus use the Texas forum to make money.

Ramshorn contends that Smith was not its employee and did not intend for him to have authority to represent it in the Texas negotiations. However, Ramshorn allowed Smith to hold himself out as its president for a period of years, and its general manager Arango believed him to be her boss. Nabors had portrayed Smith as Ramshorn's president during the run-up to the Texas meetings, and Ramshorn consistently held him out as having the authority to sell its Class A shares. Nor is it persuasive that during the meetings Smith suddenly stopped conveying the sense that he was in charge of Ramshorn. Although the ERG SPA does not list Smith as a Ramshorn officer, the organizational chart which was provided to ERG during its visit to Colombia referred to Smith as Ramshorn's president. Ramshorn had acquiesced to this arrangement in part through its being almost totally controlled by Nabors.

We thus affirm the court of appeals and hold that the trial court had specific jurisdiction over Ramshorn because its actual and apparent president purposefully availed the company of the Texas jurisdiction by negotiating at relative length in Texas for sale of its shares to a Texas buyer. ERG's claims directly arise out of this contact with the Texas forum, because they allege that Ramshorn made various misrepresentations during these Texas dealings.

## D. No General Jurisdiction over Ramshorn

In light of the Supreme Court's guidance in *Goodyear* and *Daimler*, we do not agree with ERG that the trial court had general jurisdiction over Ramshorn. As we note above, where a corporation does not have a principal place of business in Texas, is not incorporated in Texas, and where it has only limited contacts with Texas, it does not have continuous and systematic contacts with Texas that rise to a level that renders it essentially at home in the Lone Star State.[101]

ERG urges that Ramshorn's operations were managed and controlled from Houston. Indeed they were. However, these contacts were not pervasive enough to establish general jurisdiction over Ramshorn.[102] According to ERG, because a Houston-based company, Shona Energy International, Limited (Shona) owned Ramshorn's Class B shares, and because Nabors owned its Class A shares, general jurisdiction exists. But although Rams-

horn's entanglement with its owners is pertinent to the specific jurisdiction analysis in analyzing the degree to which it purposefully availed itself of Smith's ability to negotiate with a Texas buyer, an entity's mere ownership in the forum state is insufficient for that state to have general jurisdiction over the subsidiary defendant.[103]

To hold otherwise would be to blur "the fundamental distinction between general and specific jurisdiction that is firmly embedded in our jurisprudence."[104] As we have noted, specific jurisdiction encompasses cases which arise out of the defendant's contacts with the forum,[105] and so a trial court may have specific jurisdiction over a foreign subsidiary with respect to claims that its parent company and its agents—vested with sole ownership of a subsidiary, and thus control over the sale of its shares, and with which the subsidiary's operations are deeply entangled— misrepresented the of its assets. However, a finding of general jurisdiction, which does not depend on the claims at hand, requires some deeper connection with the forum state than mere ownership by a local corporation. Indeed, "ties serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has general jurisdiction over a defendant."[106] Just as in *Goodyear*, where an American corporation's ownership of Luxembourgian, French, and Turkish companies was itself insufficient to confer jurisdiction over the foreign subsidiaries, we hold that Nabors'

---

**101.** *Daimler AG v. Bauman,* —— U.S. ——, 134 S.Ct. 746, 760, 187 L.Ed.2d 624 (2014).

**102.** *See id.* at 751.

**103.** *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 131 S.Ct. 2846, 2856, 180 L.Ed.2d 796 (2011).

**104.** *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 584 (Tex.2007); *see also Goodyear,* 131 S.Ct. at 2855 (2011).

**105.** *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

**106.** *Goodyear,* 131 S.Ct. at 2855 (emphasis in original).

ownership of the Ramshorn shares is insufficient to give Texas courts general jurisdiction over Ramshorn.

### D. No Jurisdiction over Parex Bermuda

Finally, we address personal jurisdiction over Parex Bermuda. ERG appears to rely exclusively on its theory that jurisdiction over Parex Bermuda exists through its purported ratification of Parex Canada's contacts with Texas. However, because we hold that there is no personal jurisdiction over Parex Canada, ERG's ratification theory is inapposite. ERG's briefs have not proposed any independent basis for finding jurisdiction over Parex Bermuda, and we therefore affirm the court of appeals' judgment on this issue that no personal jurisdiction—general or specific—over Parex Bermuda exists.

### III. Conclusion

To sum up, the trial court did not have specific or general jurisdiction over Parex Canada and Parex Bermuda, but it did have specific—though not general—jurisdiction over Ramshorn. For these reasons, we affirm the judgment of the court of appeals.

JUSTICE GUZMAN filed an opinion concurring in part and dissenting in part, in which JUSTICE BOYD joined.

JUSTICE BROWN did not participate in the decision.

---

1. BLACK'S LAW DICTIONARY (10th ed.2014); THE MERRIAM-WEBSTER THESAURUS: NEW EDITION (2005) (cross-referencing to "accidental"); WEBSTER'S NEW INTERNATIONAL DICTIONARY (3d ed.2002); ROGET'S II THE NEW THESAURUS (1980); WEBSTER'S COLLEGIATE THESAURUS (1976); WEBSTER'S NEW DICTIONARY OF SYNONYMS (1973); WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed.1953).

2. "Parex Canada" refers to Parex Resources, Inc.

JUSTICE GUZMAN, joined by JUSTICE BOYD, concurring in part and dissenting in part.

### Fortuitous:

happening by chance or accident; occurring unexpectedly, or without known cause; occurring without deliberate intention; accidental.

*Synonyms:* chance, adventitious, unexpected, casual, incidental, fluky, odd, inadvertent, unintentional, unintended, unplanned, unpremeditated, unwitting.

 *Antonyms:* deliberate, intended, intentional, planned.[1]

Parex Canada's contacts with Texas were anything but fortuitous.[2] Parex Canada intentionally, knowingly, and purposefully engaged in repeated contacts with Texas to negotiate a share purchase agreement, and the fallout from those negotiations was directly tied to this forum. In fact, Texas is the focal point of both the contacts and the alleged harm. Yet the Court disregards Parex Canada's purposeful availment of the forum to engage in protracted business negotiations as qualitatively inconsequential while focusing its substantive discussion on contacts that are jurisdictionally irrelevant—the plaintiff's, Nabors,[3] and the assets that are the sub-

---

3. "Nabors" refers to the Nabors entities, including Nabors Industries, Ltd.; Nabors Industries, Inc.; Nabors Corporate Services, Inc.; and Nabors Global Holdings II. We need not distinguish among the various Nabors entities for purposes of the jurisdictional analysis because Nabors Corporate Services provided management and other professional services to the affiliated Nabors entities from its Houston offices and Parex Canada's relevant communications were directed to Nabors's Houston office.

ject-matter of the contract. The inquiry into the "minimum contacts" necessary to confer specific jurisdiction, however, "focuses on the relationship among the defendant, the forum, and the litigation."[4] Affording due deference to the trial court's implied findings, as we are required to do, Parex Canada's purposeful negotiation and bidding activities in Texas constitute minimum contacts conferring specific jurisdiction over Parex Canada for claims arising from those activities. Because the Court holds that Parex Canada need not appear in a Texas court to answer claims arising directly from its purposeful forum-state conduct, I respectfully dissent.

The lynchpin of specific personal jurisdiction is purposeful availment, which centers on a defendant's intentional contacts with the forum state. Although the defendant's intentional contacts with Texas were accomplished technologically in this case, the jurisdictional analysis does not depend on whether the defendant's presence in the forum is virtual or physical. In evaluating the existence of specific personal jurisdiction, the determinative questions are (1) whether a nonresident defendant has purposefully conducted an activity in a forum to establish minimum contacts, and (2) whether the cause of action arises from those forum contacts.

Here, Parex Canada deliberately engaged in bidding and negotiation activity in Texas, offering millions of dollars for a unique asset owned by Texas-based Nabors and discussing the possibility of an ongoing, future business relationship between their affiliates. Nabors ended the discussions because of a binding contract with ERG Resources, LLC (ERG), another Texas-based company,[5] but Parex Canada continued to intentionally engage in communications with Nabors; ERG alleges these communications constituted tortious interference. Parex Canada knowingly and purposefully directed numerous emails, attachments, and phone calls into Texas, and thus, the alleged tort occurred in Texas. Accordingly, Parex Canada's Texas communications constitute sufficient minimum contacts to support the exercise of specific jurisdiction in accordance with traditional notions of fair play and substantial justice. Because the operative facts of ERG's claim arise from Parex Canada's minimum contacts with Texas, Texas courts have specific jurisdiction over Parex Canada.

The Court disclaims making a distinction between in-person communications and electronically effectuated communications, but its jurisdictional analysis does just that. By basing the jurisdictional analysis on the erroneous premise that Parex Canada's only connection to Texas was Nabors's presence in Texas, the Court ignores the reality that Parex Canada's communications *occurred in Texas.* Unsurprisingly, after characterizing Parex Canada's communications as a connection with Nabors, rather than as a connection with Texas, the Court concludes specific personal jurisdiction over Parex Canada is lacking.

The Court's conclusion thus dismisses emails, attachments, and phone calls as irrelevant jurisdictional contacts, which insulates nonresident tortfeasors from liability for torts committed in Texas as long as the tort is committed through virtual means, rather than in person. Undoubt-

4. *Walden v. Fiore,* —— U.S. ——, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014) (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)).

5. For convenience, I join the Court in referring to both ERG and Jason R. Searcy, the successor to ERG's claims, as ERG.

edly, technology as a substitute for physical presence will persist and technological innovations for communication will surely proliferate as the 21st century progresses, which makes the precedent the Court establishes today an especially troubling and dangerous development in our jurisprudence. Moreover, the Court's analysis and conclusion regarding specific personal jurisdiction places Texas's jurisprudence out of step with other jurisdictions.

Because the Court confounds well-settled precedent and conducts a flawed jurisdictional analysis, I cannot join the Court's holding that the trial court lacked specific jurisdiction over Parex Canada. I agree, however, with the Court's conclusion that the trial court possesses specific jurisdiction over Ramshorn International, Limited (Ramshorn), and lacks jurisdiction over Parex Resources (Bermuda), Ltd. (Parex Bermuda).

## I. Background

The trial court denied Parex Canada's special appearance, concluding it had personal jurisdiction over Parex Canada. Because the trial court made no express fact findings, we imply "all facts necessary to support the judgment [that are] supported by the evidence." *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002). Tellingly, the Court fails to follow the usual convention of articulating the proper standard of review for fact findings, and more importantly, the Court's factual recitation is replete with crucial omissions and impermissible assumptions, which unfortunately permeate

the Court's jurisdictional analysis. Accordingly, I begin by setting forth the relevant facts, while affording proper deference to the trial court's implied findings.[6]

In the fall of 2011, Nabors announced its intention to divest many of its exploration-related oil and gas holdings to focus on drilling operations. Nabors's Class A shares of Ramshorn were among the assets Nabors planned to sell, and ERG submitted an initial offer to purchase the shares for $30 million on December 13, 2011. As negotiations between ERG and Nabors proceeded, ERG conducted due diligence on the acquisition by attending a presentation in Colombia and accessing documents in a virtual data room hosted by a Texas server. On February 17, 2012, ERG increased its offer to $31.5 million. Nabors rejected ERG's offer, and Nabors's head of exploration, Jordan Smith, actively pursued other buyers willing to pay more. But ERG was persistent and made successively increasing offers—$35 million on February 22, 2012, then $39 million on March 7, 2012, and finally $45 million on March 8, 2012; Nabors accepted ERG's $45 million offer and executed a share purchase agreement (SPA) with ERG on March 9, 2012.

Meanwhile, Parex Canada attempted to contact individuals in Colombia to inquire about purchasing the Ramshorn shares, but was unsuccessful in getting a response. In early 2012, Parex Canada contacted Royal Bank of Canada (RBC) for assistance, because RBC had previously acted on Ramshorn's behalf in an earlier transaction.[7] On March 1, 2012, Parex Canada

---

6. ERG argues the court of appeals erred by failing to consider all evidence filed with the trial court. Any error is immaterial because, even without considering the additional evidence ERG cites, I conclude Parex Canada established sufficient purposeful contacts with Texas to confer specific jurisdiction. The Court, however, concludes the evidence was

insufficient to establish personal jurisdiction over Parex Canada, but it neither identifies the evidence considered, nor addresses ERG's evidentiary arguments.

7. The Court characterizes Nabors as initiating contact with Parex Canada regarding the 2012 sale of the Ramshorn shares because (1)

sent an email to RBC's Managing Director, Bevin Wirzba, with a letter of intent (LOI) attached. The LOI was dated March 2, 2012, and offered $40 million for the "entire issued share capital of Ramshorn."[8] Wirzba forwarded the LOI to Nabors's head of exploration, Jordan Smith. The following day, Scott Peterson (Nabors's Associate General Counsel) emailed Nicolas Marot (Parex Canada's Manager of New Ventures), David Taylor (Parex Canada's Vice President of Exploration and Business Development), and Wirzba to express gratitude for the offer and to clarify that only the Class A shares of Ramshorn were available for acquisition.[9] To illustrate the transaction structure Nabors envisioned, Peterson attached a draft SPA to the email, which stated the transaction would close at Nabors's offices in Houston, Texas. Peterson also offered to provide additional details about the assets if Parex Canada would sign a confidentiality agreement that was attached to his email. The confidentiality agreement included a Texas choice-of-law provision and a Harris County, Texas, venue-selection clause. Shortly thereafter, Parex Canada signed a modified version of the confidentiality agreement that changed the venue and choice-of-law provisions to New York. Rather than immediately suggesting any changes

---

RBC previously assisted Nabors in contacting potential purchasers in 2010 and (2) Smith testified that he requested RBC reach out to the same fifty buyers, including Parex Canada sometime in "early March [2012] ... towards the end of the first week or beginning of the second week of March." *Ante* at 76-77. Considering this "fact" of who initiated contact as highly significant, the Court views all of Parex Canada's contacts with Nabors "in light of the fact that Nabors reached out to RBC, which in turn notified Parex Canada of the opportunity to acquire shares regarding Colombian assets.... " *Id.* at 76 ("Parex Canada also did not initiate the interactions that it eventually had with Nabors. It was Nabors who solicited RBC for its investment banking services in order to find potential buyers of its shares."); *see also id.* at 76 (claiming Parex Canada "only became involved with Nabors after this solicitation").

But evidence also supports a finding that Parex Canada initiated the contact with RBC in 2012, who then assisted Parex Canada in contacting Nabors with a bid for the Ramshorn shares. David Taylor, Parex Canada's Vice President of Exploration and Business Development, explained that Parex Canada initiated contact with RBC in 2012 because they were interested in potentially acquiring Nabors's assets. Taylor testified that:

somewhere in the first quarter of 2012, *we contacted RBC.* And the reason *we contacted RBC* is because they were acting on behalf of Ramshorn in 2011 when they were undergoing a corporate sale or trans-

action at the time. So we thought they may be able to help us with a contact.

(Emphases added.) Therefore, I believe we must defer to the trial court's implied finding that Parex Canada purposefully solicited RBC's assistance in negotiating with Nabors regarding the Ramshorn Class A shares in 2012, before RBC was able to contact Parex Canada about the opportunity. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex.2002) (explaining reviewing courts must imply "all facts necessary to support the [trial court's] judgment and supported by the evidence"). Regardless, Nabors ended communications with Parex Canada on March 9, 2012, at which point, Parex Canada reinitiated communications and continued to negotiate and bid in Texas. Importantly, Parex Canada's negotiation and bidding activities in Texas after March 9, 2012, form the basis of ERG's tortious-interference claims.

8. Parex Canada executed two March 2, 2012 LOIs that were identical, except one was addressed to RBC Capital Markets in Calgary, Canada and one was addressed to Ramshorn Investments Inc.'s Houston office. The LOIs were sent by Parex Canada on behalf of one of its subsidiaries, Parex Resources (Colombia) Ltd. (Parex Colombia).

9. The signature block on Scott Peterson's emails stated his position as "Associate General Counsel" for "NABORS CORPORATE SERVICES, INC." at "515 W. Greens Rd., Suite 1200, Houston, TX 77067."

to the draft SPA, however, Parex Canada indicated it was "working on the SPA right now" and requested that Nabors's chief financial officer, Bruce McConnell, contact Parex Canada's chief financial officer, Ken Pinsky.

On March 3, 2012, Parex Canada contracted with RBC for Wirzba to provide advice regarding the potential acquisition of Nabors's Ramshorn shares and to negotiate with Nabors on its behalf. Wirzba did just that, emailing a revised LOI and $40 million offer to Nabors's Houston office on March 6, 2012, the day after Wirzba discussed the transaction with Nabors's Vice President and General Counsel, Laura Doerre.[10] On March 7, 2012, after learning that Nabors was "marching down the path with another party," Wirzba increased the offer to $50 million, removed financing conditions, and offered additional incentives for acceptance, including shortening the due-diligence period and making a $3 million deposit. While Nabors was considering the offer, Parex Canada was granted access to the virtual data room in Houston so it could conduct due diligence.[11] Continuing the negotiations,

Wirzba informed Nabors on March 8, 2012, that Parex Canada was willing to include a provision in the SPA granting Nabors the right and option to provide drilling rigs following the sale's consummation.

However, the very next day, March 9, 2012, Nabors accepted ERG's increased offer of $45 million for the Ramshorn Class A shares. Peterson informed Wirzba and Taylor by telephone and email that Nabors had executed an SPA with ERG, but also stated he would reinitiate contact if the deal with ERG failed to close. Evidence supports the trial court's implied finding that, as of March 9, 2012, Parex Canada knew that Nabors had a deal with Texas-based ERG for $45 million that was set to close on March 15, 2012.[12]

In response to Peterson's March 9 email explaining Nabors had made a deal with another buyer, Wirzba asked Nabors to "reconsider [Parex Canada's] proposal at a level of $55 million." Wirzba followed up with Peterson by telephone, leaving him a voicemail requesting information about the status of Nabors's executed SPA. Peterson responded to Wirzba via email: "To answer your question, things are proceeding

10. The LOI was again sent on behalf of Parex Colombia.

11. The record shows that upon receiving due-diligence request lists from potential purchasers, Nabors's Houston, Texas employees would upload data to the virtual data room, which was housed on Houston-based servers.

12. One Nabors executive testified that "[o]n March 9th, Nabors advised Parex that it had entered into [an] SPA with ERG and was scheduled to close that transaction on March 15." Another Nabors executive testified that Parex Canada was informed "that [Nabors] had a deal with somebody else and that it was scheduled to close the next week"; a Parex Canada executive conceded that the term "deal" implies a binding contract. Furthermore, a Parex Canada executive admitted he had heard "rumours that there were other

parties involved in discussions" by March 6, 2012 and testified there were "no secrets" in Colombia.

The court of appeals likewise deferred to "the trial court's implicit finding that Parex Canada knew on March 9, 2012 that ERG was the counterparty." 427 S.W.3d 407, 422 (Tex.App.2014). Nonetheless, the Court evidently rejects the trial court's implied finding on this point. Instead, the Court emphasizes the "parties dispute when exactly Parex Canada's executives came to know about the ERG SPA," *ante* at 65, and vaguely concludes "Parex Canada did not find out that ERG was a potential counterparty to Nabors Global for purchase of the relevant assets until a relatively late stage in the deal," *id.* at 76; *see also id.* at 73 ("ERG, of whom Parex Canada did not know until relatively late in its negotiations, turned out to be incorporated and headquartered in Texas.").

apace with our counterparty under the SPA. I'll let you know if that changes." Despite Peterson's reminder that Nabors had already executed an SPA, Wirzba sent a responsive email in which he continued to press Parex Canada's higher offer, stating, "I presume the extra $5mm didn't convince you to terminate discussions." Peterson countered, "It's the fact it was already signed that caused the rejection. $5mm is always attractive (when we're in a position for it to be!)."[13] Notwithstanding the vehement reminder that Nabors had a contractual commitment to ERG, Parex Canada persisted in conducting due diligence, accessing information from the Houston-based virtual data room, and communicating with Nabors's Houston-based staff to request additional data be uploaded to the server for Parex Canada's review.

Disregarding Peterson's earlier assurances that Parex Canada would be notified if the sale of Nabors's Class A Ramshorn shares fell through, Wirzba once again initiated contact with Peterson in Houston. Wirzba called Peterson on March 16, 2012, to inquire about the deal's status. Peterson informed Wirzba that the deal did not close on March 15, but an extension was in the works. During the phone call, Wirzba alluded to Parex Canada's willingness to increase the offer and about twenty minutes later emailed an increased offer of $75 million to Nabors's executives (Peterson, Doerre, Smith, and McConnell). The email stated:

> [W]e understand that your counterparty on the Ramshorn Colombia transaction has not yet closed the transaction. We also understand that you had originally given them until the 15th of March to close the transaction. Our client (Parex Resources) will be sending you, within the hour, a signed LOI for the interests with an increased revised offer of $75MM with an effective date of February 29th. As demonstrated over the past 3 weeks, we have been committed to seeing this transaction through, and believe that this revised offer is a material increase that should be considered by your organization.

Pinsky, Parex Canada's chief financial officer, subsequently emailed Nabors a revised LOI addressed to Nabors's Houston office, detailing a subsidiary's intention to purchase Nabors's Class A shares for $75 million. Less than an hour later, Pinsky sent Nabors another email to express his understanding that "a client relationship may be part of [Nabors's] decision on the sale of [Nabors's] Ramshorn interest" and assured Nabors that Parex Canada "[was] ready and able to serve notice for termination on a current contract and enter into good faith negotiations with Nabors Colombia."

The same day, ERG and Nabors amended the SPA to extend the closing date to March 19, 2012, with an effective date of March 15, 2012. Accordingly, Doerre explained to Wirzba that the deal with ERG had not closed or terminated and the closing had been extended to the following Monday. Doerre thanked Wirzba for the "continued interest" and assured him that he would be promptly notified if Nabors would be "in a position to entertain a proposal from [Wirzba's] client." [14] Addi-

---

**13.** In his deposition, Peterson testified that "[h]aving signed the other agreement, there was no point in having a further discussion with Mr. Wirzba," which is why Peterson informed Wirzba that Nabors was "[not] in-terested in any additional money at that point."

**14.** Laura Doerre's emails included a signature block stating her position as "Vice President and General Counsel" at "NABORS

tionally, Doerre instructed Wirzba that any offer "would need to be in substantially the form of the attached draft agreement," which set Houston as the closing location, included a Harris County, Texas venue-selection clause, and specified the agreement would be governed by Texas law.

According to ERG, Nabors refused to close on the morning of Monday, March 19, 2012, despite ERG's tendered performance. Around 3 p.m., Nabors suggested to ERG via email that the missed closing should end the negotiations; however, ERG never signed a proposed termination agreement Nabors faxed to ERG a couple hours later.

Meanwhile, rather than waiting to hear from Nabors, Pinsky emailed Peterson on the afternoon of March 19 to inquire if the deal had closed. A few hours later, Wirzba also sent a follow-up email, asking Peterson and Smith if the deal had closed. Nabors did not respond. Consequently, on March 20, Pinsky again emailed Peterson, requesting a call concerning the Ramshorn shares. Pinsky stated that Parex Canada was "more qualified to close and honor any future covenants" and he wished to "discuss the number directly with Nabors with a view to making an increased offer." Wirzba also emailed Nabors's vice president and general counsel on March 20 to emphasize Parex Canada's desire to discuss "next steps" if the transaction had not closed.

The same day, ERG sued several entities, including Nabors and Parex Canada, alleging Parex Canada tortiously interfered with ERG's purchase agreement with Nabors and seeking specific performance of the agreement. The next day, Pinsky resubmitted an LOI offering $75

CORPORATE SERVICES, INC." located at "515 W. Greens Rd., Suite 1200, Houston, TX

million for Nabors's Class A shares addressed to Nabors's Houston office; once again, the proposed purchaser was Parex Colombia. The sale was temporarily restricted by an injunction issued by a Bermuda court, but the injunction was discharged on April 5, 2012.

On April 9, 2012, Parex Canada formed a new subsidiary, Parex Bermuda, to execute an SPA with Nabors regarding the Class A Ramshorn shares. An SPA between Parex Bermuda and Nabors was executed on April 12, 2012. On April 17, 2012, the Parex Bermuda board ratified the acquisition of Ramshorn's Class A shares, and ERG subsequently added Parex Bermuda as a defendant in its tortious-interference suit.

## II. Discussion

Texas's long-arm statute "extends Texas courts' personal jurisdiction 'as far as the federal constitutional requirements of due process will permit.'" *BMC Software*, 83 S.W.3d at 795 (quoting *U–Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)). "For a State to exercise [specific personal] jurisdiction consistent with due-process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, —— U.S. ——, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014). In other words, courts usually can exercise specific personal jurisdiction consistent with traditional notions of fair play and substantial justice "when (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to the defendant's contacts." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex.2010).

77067."

## A. Specific Personal Jurisdiction Over Parex Canada Exists

Applying the proper deferential standard of review to the trial court's judgment, I would hold specific jurisdiction exists over Parex Canada. Parex Canada purposely directed contacts into Texas to bid on a multi-million-dollar asset transaction and to explore the possibility of an ongoing, future business relationship between Parex Canada's affiliates and Nabors's affiliates with Texas operations; thus, even if the asset owner's presence in Texas was merely "coincidental" or a "mere accident," Parex Canada's contacts with Texas were not. *Ante* at 73, 77. Parex Canada deliberately engaged in negotiation and bidding activities in Texas through technological instrumentalities, and ERG's cause of action arises from those Texas-based activities. Specific jurisdiction therefore exists over Parex Canada because (1) Parex Canada engaged in purposeful contact with Texas, (2) the cause of action arises directly from that contact, and (3) exercising jurisdiction over Parex Canada comports with traditional notions of fair play and substantial justice.[15] Recognizing Parex Canada's purposeful contacts with Texas as giving rise to specific jurisdiction also accords with binding United States Supreme Court precedent and prevents Texas from becoming a jurisprudential outlier on personal jurisdiction.

## 1. Sufficient and Purposeful Contacts with Texas

"Where a defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,' it submits to the judicial power of an otherwise foreign sovereign to the extent that power is exercised in connection with the defendant's activities touching on the State." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011) (plurality op.) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). By intentionally conducting an activity within a state, a defendant has necessarily invoked the benefits and protections of its laws and is subject to the State's jurisdiction for claims arising from the in-state activity. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ("[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state.").[16]

Recently, the Supreme Court further explained that "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden*, 134 S.Ct. at 1123. Thus, a defendant's contacts with the forum must result from the defendant's conduct,[17] not the

---

**15.** Whether Parex Canada's contacts with the forum were sufficient to confer general jurisdiction is, therefore, immaterial.

**16.** Accordingly, the test is purposeful availment *of the forum*, not purposeful availment *of the forum law*, as it is mistakenly articulated by the Court. *See ante* at 75 ("purposeful availment of Texas law").

**17.** Although a defendant's contacts with a forum-state resident are not wholly irrelevant, the focus of the inquiry is on "the defendant's

contacts with the forum State itself." *See Walden*, 134 S.Ct. at 1122; *see also TV Azteca S.A.B. De C.V. v. Ruiz*, 490 S.W.3d 29, 43–44, 2016 WL 766927, at *8 (Tex.2016) ("[T]he fact that the plaintiff lives and was injured in the forum state is not irrelevant to the jurisdictional inquiry, but it is relevant only to the extent that it shows that *the forum state* was 'the focus of the activities of the defendant.' " (quoting *Keeton*, 465 U.S. at 780, 104 S.Ct. 1473)); *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 157 (Tex.2013)

unilateral actions of a plaintiff or a third party.[18] A defendant must *choose* to create contacts with Texas for Texas courts to have specific jurisdiction over claims stemming from those contacts,[19] but the defendant's subjective intent or reasoning behind its decision to establish those contacts is irrelevant.[20]

A defendant can choose to avoid creating contacts with a forum state, such as by "purposefully structur[ing] transactions to avoid the benefits and protections of a forum's laws." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 808 (Tex.2002); *see also Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 792 (Tex.2005) (explaining the insertion or deletion of forum-selection clauses can provide some evidence regarding the parties'

intent to be or not to be subject to local jurisdictions). But inserting a choice-of-law or forum-selection provision into a contract with a forum-state resident will not negate intentional contact with the forum state. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 154 (Tex.2013) (recognizing that defendants' "subjective intent does not negate their business contacts"); *see also Michiana*, 168 S.W.3d at 792 ("Generally, a forum-selection clause operates as consent to jurisdiction in one forum, not proof that the Constitution would allow no other."). Thus, defendants cannot insulate themselves from liability for a tort committed in Texas against a Texas resident simply by including a provision in a third-party contract stipulating another forum, especially when the tort claim does not arise from the contract.[21]

("The focus is properly on the extent of the defendant's activities in the forum, not the residence of the plaintiff."). A defendant thus lacks minimum contacts with the forum state if a nonresident's only contact with the forum is injury to a forum-state resident arising from contacts *outside* the forum state, *Walden*, 134 S.Ct. at 1124–25, or if a nonresident's only contact with the forum is selling an item to a forum-state resident *outside* the forum state, *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 787–88 (Tex.2005).

18. *See Walden*, 134 S.Ct. at 1122 (explaining that in *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the Oklahoma courts lacked "personal jurisdiction over an automobile distributor that supplies New York, New Jersey, and Connecticut dealers based only on an automobile purchaser's act of driving it on Oklahoma highways"); *Moncrief Oil*, 414 S.W.3d at 152 (describing *Michiana* as holding that receiving a phone call from Texas and "transferring the vehicle to the shipper the buyer had designated to transport the vehicle to Texas" did not "constitute[] purposeful availment because the dealer 'had no say in the matter'"); *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 340 (Tex.2009) (explaining the defendant's "contacts with Texas were also not the result of the unilateral actions of a third party," but rather the defendant "was

a willing participant" in the transaction giving rise to the cause of action); *Michiana*, 168 S.W.3d at 794 (concluding there was no specific jurisdiction "[b]ecause Michiana's only contact with Texas was [the plaintiff's] decision to place his order from there").

19. *See Moncrief Oil*, 414 S.W.3d at 153 ("They were not unilaterally haled into forming contacts with Texas; rather, they agreed to attend Texas meetings.").

20. *See id.* at 147 ("The defendants claim their intent in attending the meetings was to discuss an unrelated matter ... [b]ut what the parties thought, said, or intended is generally irrelevant to their jurisdictional contacts.").

21. Although Parex Canada may have attempted to structure its transaction to avoid being subject to jurisdiction in Texas, ERG's claims arise from Parex Canada's purposeful Texas communications, not from the subsequently executed transaction between Nabors and Parex Bermuda that contained New York forum-selection and choice-of-law provisions. Furthermore, while the executed SPA included New York provisions, the forum-selection and choice-of-law provisions in the SPA drafts exchanged during this time differed, with some selecting Texas, rather than New York. Regardless, a "forum-selection clause ... [is]

Although a defendant's contacts with a forum must be intentional, *Walden*, 134 S.Ct. at 1123, a defendant need not *"physically* enter the forum State" to establish minimum contacts, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *see also Walden*, 134 S.Ct. at 1121 (recognizing that "a nonresident's physical presence within the territorial jurisdiction of the court is not required" to give rise to specific jurisdiction). Directing communications into a forum state can constitute sufficient minimum contacts with a jurisdiction. *See. Burger King*, 471 U.S. at 476, 105 S.Ct. 2174 ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."). Therefore, when conducting business and activities in a forum, defendants cannot hide behind technological instrumentalities to avoid the consequences of their purposeful contacts with the fo-

rum. *See Retamco*, 278 S.W.3d at 339 ("[W]hile [the nonresident defendant] may not have actually entered the state to purchase this real property, '[j]urisdiction ... may not be avoided merely because the defendant did not physically enter the forum state.'" (quoting *Burger King*, 471 U.S. at 476, 105 S.Ct. 2174)).

Attempting to acquire Nabors's Ramshorn Class A shares, Parex Canada "purposefully avail[ed] itself of the privilege of conducting [the negotiation and bidding] activities within [Texas], thus invoking the benefits and protections of its laws," and subjecting itself to Texas jurisdiction for claims arising from those activities. *See Hanson*, 357 U.S. at 253, 78 S.Ct. 1228. Parex Canada initiated contact with RBC and Nabors in 2012[22] and intentionally communicated with Nabors in Texas regarding the purchase of a unique asset and the possibility of future business relationships between affiliates, as illustrated by the inclusion of a "Right and Option to Provide Drilling Rigs" provision of a draft SPA.[23] *See Burger King*, 471 U.S. at 479,

---

not proof that the Constitution would allow no other [forum]," and in any event, ERG would not be bound by an agreement between Nabors and the Parex entities. *See Michiana*, 168 S.W.3d at 792. Consequently, the Court's focus on the later-executed contract between Parex Bermuda and Nabors is misplaced.

**22.** In cases involving claims between contracting parties, courts have found whether the nonresident was a passive purchaser versus an active solicitor or negotiator to be relevant in determining the existence of personal jurisdiction. *Compare Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 933 (11th Cir.2007) ("In our view, [the nonresident defendant] was more than a mere passive purchaser, and the exercise of specific jurisdiction by the district court did not offend the Due Process Clause."), *with Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 152 (3d Cir.1996) (holding no purposeful availment where the nonresident de-

fendant "was merely a 'passive buyer' of [the plaintiff's] product").

**23.** Even a small sampling of the deliberate contacts Parex Canada established with Texas during the time Nabors had a signed contract with ERG demonstrates purposeful availment: (1) accessing due-diligence documents in a virtual data room administered in Houston and communicating with individuals working in Houston to facilitate access to additional data; (2) sending an email to Houston-based Peterson, urging Nabors to reconsider a $55 million offer; (3) placing a phone call and leaving a voicemail message to a Houston number inquiring about the status of Nabors's contract with ERG; (4) sending an email to Houston-based Peterson, emphasizing that Parex Canada was offering an additional $5 million; (5) placing a phone call to a Houston telephone number alluding to Parex Canada's willingness to increase its offer; (6) sending an email to Houston-based Nabors executives, offering $75 million and

105 S.Ct. 2174 (recognizing the relevance of negotiations and contemplated future interactions); *cf. Michiana,* 168 S.W.3d at 794 (defendant seller's only contact with Texas was *responding* to a purchaser's offer).

Although the ubiquity of cell phones means area codes "no longer necessarily indicate[ ] anything about the caller's location," *Michiana,* 168 S.W.3d at 791, the evidence supports a finding that Parex Canada knew it was directing phone calls to Texas.[24] Furthermore, Parex Canada's emails and attachments were expressly addressed to locations in Texas. On March 2, March 6, and March 16, 2012, Parex Canada sent LOIs to Nabors that were addressed to Nabors's Houston office. The signature blocks on Nabors's email replies to Parex Canada's repeated bids also contained Nabors's Houston address, further highlighting that Parex Canada purposefully conducted its bidding and negotiating in Texas—it was not "unilaterally haled into forming Texas contacts." *See Moncrief Oil,* 414 S.W.3d at 153.

Recently, the United States Supreme Court again recognized that "physical presence in the forum is not a prerequisite to jurisdiction," but noted that "physical entry into the State—either by the defendant in person or through an agent, goods, mail or some other means—is certainly a relevant contact." *Walden,* 134 S.Ct. at 1122. Although the Supreme Court reserved "questions about virtual contacts for another day," *see id.* at 1125 n. 9, logic dictates that an email with an attachment addressed to a specific address be considered analogous to physical mail. As such, the emails that Parex Canada sent to Nabors with attachments addressed to a Houston address are relevant jurisdictional contacts.

The Court, however, fails to recognize Parex Canada conducted its negotiation and bidding activities *in Texas* through electronic means[25] and instead concludes specific personal jurisdiction is lacking because the "assets that Parex Canada wanted to buy happened to be owned by a Bermudian company which had some Texas operations." *Ante* at 76. The Court thus erroneously grounds its analysis on Nabors's "coincidental presence in Texas" and on Parex Canada's presumed intent, *id.* at 73, rather than Parex Canada's purposeful conduct—deciding to negotiate in

emphasizing the level of commitment demonstrated over the "past 3 weeks"; (7) sending an email to Houston-based Nabors executives with a revised LOI addressed to Nabors's Houston office; and (8) sending an email to Houston-based Nabors executives to express Parex Canada's willingness to enter into a contract with Nabors's subsidiary if a client relationship would be a factor in Nabors's decision regarding the sale of its Ramshorn shares.

24. 427 S.W.3d at 422 & n. 14 (noting the evidence suggests "Parex Canada knew it was negotiating with Nabors-related individuals located in Texas"); *see also Internet Sols. Corp. v. Marshall,* 39 So.3d 1201, 1208 (Fla. 2010) ("The determination of whether certain acts constitute communications into Florida is straightforward when the case concerns telephonic communications, written communications, or electronic communications in the form of e-mails or facsimiles, because those communications are directed to reach a specific recipient in a specific forum; in other words, it is clear that the nonresident defendant's communications were made into Florida.").

25. Although the Court denies making a distinction between virtual and in-person communications, *ante* at 70, the analysis the Court employs tells a different story, *see id.* at 70 (distinguishing *Calder* on the basis that the tort occurred in the forum state). Moreover, the Court never identifies where it believes the negotiation and bidding activity occurred.

Texas with Nabors.[26] *See Moncrief Oil,* 414 S.W.3d at 153 (agreeing to attend Texas meetings constituted purposeful availment). Although bidding for Nabors's Colombian assets could have occurred anywhere, it actually occurred in Texas, subjecting parties to the jurisdiction of Texas courts for claims arising from the bidding activities. Similarly, a nonresident defendant who assaults a nonresident plaintiff in Texas is subject to Texas jurisdiction for claims arising from the assault, even though the plaintiff's presence in Texas when the assault occurred is merely "fortuitous." *Cf. id.* at 154 (a nonresident driving through Texas who gets in a vehicular accident in Texas is subject to Texas jurisdiction for claims stemming from that accident).

The Court's focus on the location of the negotiated assets is similarly unwarranted—whether the assets were located in Midland, rather than Colombia, does not alter the jurisdictional analysis in this case. "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden,* 134 S.Ct. at 1121 (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)).[27] Because the litigation here involves a tortious-interference claim, the focus of the jurisdictional analysis is the relationship among Parex Canada, Texas, and Parex Canada's communica-

tions with Nabors that allegedly tortiously interfered with ERG's Texas-based contract. Therefore, Parex Canada's purposeful negotiation and bidding activities in Texas constitute minimum contacts conferring specific jurisdiction on Parex Canada for claims arising from those activities.

### 2. Texas Contacts Substantially Connected to Operative Facts

Exercising personal jurisdiction over a nonresident defendant requires more than sufficient minimum contacts with the forum. Rather, "[s]pecific jurisdiction exists only if the alleged liability arises out of or is related to the defendant's activity within the forum." *Moncrief Oil,* 414 S.W.3d at 156; *see Spir Star,* 310 S.W.3d at 873 (specific jurisdiction exists when a "cause of action arises from or relates to the defendant's [purposeful] contacts" with the forum state). The relationship between the alleged liability and the defendant's contacts with the forum cannot be too attenuated; "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 584–85 (Tex.2007).

When the defendant's contacts with Texas are merely peripheral to a cause of action, specific jurisdiction is lacking; a nonresident defendant cannot be deprived of due process through artful pleading. Such was the case in *Moki Mac,* in which

**26.** The Court claims Parex Canada was "striving to expand its Colombian portfolio," not "attempting to meddle with a contract governed by Texas law." *Ante* at 73; *see also id.* (concluding Parex Canada lacked "any desire to launch or maintain operations in Texas"). But subjective intent "does not negate [a defendant's] business contacts." *Moncrief Oil,* 414 S.W.3d at 154. Parex Canada may not have intended to submit to the jurisdiction of Texas courts, but "it is the defendant's actions, not his expectations, that empower a

State's courts to subject him to judgment." *See J. McIntyre Mach., Ltd. v. Nicastro,* 564 U.S. 873, 883, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011) (plurality op.).

**27.** Nor is ERG asking the Court to exercise *in rem* jurisdiction. *See Hanson v. Denckla,* 357 U.S. 235, 246, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) ("The basis of [*in rem* ] jurisdiction is the presence of the subject property within the territorial jurisdiction of the forum State.").

we held specific jurisdiction was lacking in a wrongful-death suit against a Utah-based river-rafting outfitter. *Id.* at 573. That suit arose from a Texas teenager's death while hiking in Arizona, and the only alleged contact the Utah rafting company had with Texas was mailing documents to the teenager's parents in Texas. *See id.* at 573, 576. The pleadings alleged certain misrepresentations in the Utah company's materials regarding safety caused the parents to send their son on the trip, but we held the wrongful-death suit "concern[ed] principally the guides' conduct of the hiking expedition and whether they exercised reasonable care," which occurred solely in Arizona. *See id.* at 585.

Likewise, in *Moncrief Oil,* we held a tortious-interference claim was not substantially connected to the defendants' Texas contacts. *See* 414 S.W.3d at 157–58. Moncrief alleged its tortious-interference claim arose from the defendants' misappropriation of trade secrets in Texas, because the misappropriated secrets were used to create a competing enterprise and that enterprise interfered with Moncrief's business relationship with another company. *See id.* at 157. In declining to exercise personal jurisdiction over the defendants, we found the connection between the alleged tort and the contacts with Texas too insubstantial to sustain specific jurisdiction, because the tortious-interference claim centered on communications that occurred at a California meeting and the creation of a competing enterprise by another company, "not the purported misappropriation of alleged trade secrets." *Id.* In other words, the contact was peripheral to the substantial basis of the claim.

In contrast, we concluded the defendants' contacts with Texas were substantially connected to Moncrief's misappropriation-of-trade-secrets claim to give rise to specific jurisdiction as to that claim. *See id.* at 153. The alleged misappropriation of trade secrets occurred at a meeting the defendants attended in Texas; hence, the alleged liability arose directly from the defendants' contacts with Texas. *Id.* at 153.[28] As *Moncrief Oil* illustrates, if a nonresident defendant's purposeful activities within Texas are the crux of the tort claim, Texas courts have personal jurisdiction over the defendant to adjudicate that claim if doing so otherwise comports with traditional notions of fair play and substantial justice. *See id.* at 154; *cf. Kelly v. Gen. Interior Constr., Inc.,* 301 S.W.3d 653, 661 (Tex.2010) (explaining the appellate court erred by allowing a "fraud claim to proceed despite the lack of allegations and evidence that any part of the claim originates from the Officers' conduct in Texas").

Here, Parex Canada's purposeful bidding activities in Texas gave rise to ERG's cause of action—Parex Canada's "alleged liability arises out of [and] is related to [Parex Canada's] activity within [Texas]." *See Moncrief Oil,* 414 S.W.3d at 156. To establish its tortious-interference claim, ERG will have to prove "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused [its] injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex.2000).[29] Consequently, Parex Cana-

---

28. Although the information received at the Texas meetings might not have ultimately constituted trade secrets, we recognized that was a merits issue, which would be inappropriate to consider at the jurisdiction stage. *See Moncrief Oil,* 414 S.W.3d at 156 n. 15.

29. Identifying the elements of a tortious-interference claim and assessing the relationship between those elements and the alleged activity in Texas does not constitute a merits inquiry, *see ante* at 91, but rather represents the proper analysis in assessing whether a "sub-

da's bidding activities in Texas are substantially connected to the operative facts of the litigation.

The operative facts of ERG's claim revolve around Parex Canada's communications with Nabors in Texas—whether those emails and phone calls constitute "willful and intentional act[s] of interference" and "proximately caused [ERG's] injury." *See id.* Additionally, any dispute regarding the first and fourth element of a tortious-interference claim will also be Texas-focused because the "contract subject to interference" was a Texas contract and any "actual damages or loss" that ERG suffered would be in Texas. *See id.* at 77–78. Unlike *Moki Mac,* where the defendants' activities in Texas were too attenuated from the plaintiff's claims to confer specific jurisdiction, *see* 221 S.W.3d at 585, Parex Canada's activities in Texas are substantially connected to the operative facts of ERG's tortious-interference claim. Because Parex Canada's purposeful, and allegedly tortious, conduct occurred in Texas and is at the very core of ERG's suit, the exercise of specific personal jurisdiction over Parex Canada by Texas

courts is proper as long as it does not otherwise offend traditional notions of fair play and substantial justice.[30]

### 3. Exercising Specific Jurisdiction Comports with Fair Play and Substantial Justice

When a "nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice." *Moncrief Oil,* 414 S.W.3d at 154–55. In evaluating whether exercising jurisdiction over a defendant with minimum contacts would be unreasonable, we consider: "(1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies." *Id.* at 155. A forum state will usually have "a 'manifest interest' in providing its residents with a convenient forum for redress-

---

stantial connection" exists between a defendant's forum "contacts and the operative facts of the litigation," *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 585 (Tex.2007). *See also Walden,* 134 S.Ct. at 1121 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."); *id.* ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.' " (quoting *Keeton,* 465 U.S. at 775, 104 S.Ct. 1473)). Parex Canada's communications may ultimately fail to constitute an "intentional act of interference," *Prudential Ins.,* 29 S.W.3d at 77, or ERG could fail to establish another element of its tortious-interference claim; however, the merits of ERG's claims are irrel-

evant to our jurisdictional inquiry. *See Moncrief Oil,* 414 S.W.3d at 156 n. 15.

30. *See Walden,* 134 S.Ct. at 1124 (clarifying that in *Calder,* California courts had jurisdiction because "the defendants' intentional tort actually occurred *in* California"); *cf. id.* at 1119 (Nevada courts lacked jurisdiction over nonresident defendant whose "allegedly tortious conduct in Georgia ... delay[ed] the return of funds to plaintiffs with connections to Nevada"); *Hanson,* 357 U.S. at 251, 78 S.Ct. 1228 ("The cause of action in this case is not one that arises out of an act done or transaction consummated in the forum State."); *Kelly v. Gen. Interior Constr., Inc.,* 301 S.W.3d 653, 661 (Tex.2010) (holding the court of appeals erred in allowing a "fraud claim to proceed despite the lack of allegations and evidence that any part of the claim originates from the Officers' conduct in Texas").

ing injuries inflicted by out-of-state actors." *Burger King,* 471 U.S. at 473, 105 S.Ct. 2174; *see also Keeton,* 465 U.S. at 776, 104 S.Ct. 1473 ("And it is beyond dispute that [a state] has a significant interest in redressing injuries that actually occur within the State.").

The trial court's exercise of specific jurisdiction over Parex Canada does not offend traditional notions of fair play and substantial justice. Although subjecting Parex Canada to suit imposes some burden, "[d]istance alone cannot ordinarily defeat jurisdiction." *Moncrief Oil,* 414 S.W.3d at 155. Parex Canada frequents Texas and even hosted a management meeting in Houston in 2012. Moreover, Texas has a strong interest in adjudicating the underlying suit as it involves allegations of an intentional tort that occurred in Texas and injured a Texas resident. *See id.; see also Burger King,* 471 U.S. at 473, 105 S.Ct. 2174; *Keeton,* 465 U.S. at 776, 104 S.Ct. 1473. Finally, exercising jurisdiction over Parex Canada furthers the "judicial system's interest in obtaining the most efficient resolution of controversies," as it allows all of ERG's related claims to be tried together. *See Moncrief Oil,* 414 S.W.3d at 155.

**4. Consistency with Other Jurisdictions**

Exercising specific jurisdiction over Parex Canada also aligns with precedent from federal courts. *See BMC Software,* 83 S.W.3d at 795 (relying on "precedent from the United States Supreme Court and other federal courts, as well as our own State's decisions, in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction"). Federal circuits have found specific jurisdiction when communications are dispatched to a forum state and a tort claim arises from those communications. *See, e.g., Felland v. Clifton,* 682 F.3d 665,

670 (7th Cir.2012) (concluding Wisconsin had specific jurisdiction to consider a plaintiff's intentional tort claim that arose from multiple communications the defendant directed to Wisconsin); *Schneider v. Hardesty,* 669 F.3d 693, 702–03 (6th Cir. 2012) (letters mailed to Ohio constituted purposeful availment); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.,* 514 F.3d 1063, 1067, 1075–76 (10th Cir.2008) (sending a notice of claimed infringement to eBay in California to suspend plaintiffs' auction in Colorado and sending an email to plaintiffs in Colorado threatening litigation subjected defendants to personal jurisdiction in Colorado); *Oriental Trading Co. v. Firetti,* 236 F.3d 938, 943 (8th Cir. 2001) (sending fraudulent communications, in the form of phone calls, faxes, and invoices into Nebraska conferred specific jurisdiction); *Neal v. Janssen,* 270 F.3d 328, 332–33 (6th Cir.2001) (making phone calls to Tennessee and sending faxes to Tennessee constituted purposeful availment); *Vishay Intertechnology, Inc. v. Delta Int'l Corp.,* 696 F.2d 1062, 1068–69 (4th Cir. 1982) (finding specific jurisdiction when the defendant "wrote three letters and initiated five telephone calls to [the plaintiff]," which were "essential facts in [the plaintiff's] tort claims"); *Murphy v. Erwin–Wasey, Inc.,* 460 F.2d 661, 664 (1st Cir.1972) ("Where a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state."). *But see Rockwood Select Asset Fund XI(6)–1, LLC v. Devine, Millimet & Branch,* 750 F.3d 1178, 1180 (10th Cir.2014) (concluding that making a phone call to Utah and sending an opinion letter to Utah did not establish minimum contacts). Of particular significance for plaintiffs who file suit in federal courts in Texas, the Fifth Circuit has concluded that "[w]hen the actual content of communica-

tions with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Wien Air Alaska, Inc. v. Brandt,* 195 F.3d 208, 213 (5th Cir.1999); *see also Matassarrin v. Grosvenor,* No. 14–50148, 2014 U.S.App. LEXIS 21330, at *18 (5th Cir. Nov. 7, 2014) (unpublished) (concluding that sending allegedly fraudulent communications via email or fax to Texas regarding the purchase of a New Mexico condominium established minimum contacts). Even "[a] single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Lewis v. Fresne,* 252 F.3d 352, 358–59 (5th Cir. 2001).

Furthermore, federal courts have repeatedly emphasized that personal jurisdiction does not hinge on whether the defendant has physically entered the forum. *See Neal,* 270 F.3d at 333 ("Physical presence is not the touchstone of personal jurisdiction."); *Oriental Trading Co.,* 236 F.3d at 943 ("The lack of physical presence in a state cannot alone defeat jurisdiction."). Nor does specific jurisdiction depend on whether a defendant sent a physical item, such as mail, rather than sending electronic communications into the forum or otherwise accessing the forum remotely. *See MacDermid, Inc. v. Deiter,* 702 F.3d 725, 726–27 (2d Cir.2012) (determining a Connecticut court had specific jurisdiction "over a defendant who, while domiciled and working in Canada, is alleged to have accessed a computer server located in Connecticut to misappropriate confidential information belonging to her employer"); *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.,* 7 N.Y.3d 65, 818 N.Y.S.2d 164, 850

N.E.2d 1140, 1141, 1143 (2006) (concluding courts had jurisdiction over an out-of-state institutional trader that negotiated a multi-million-dollar transaction with an employee of a securities trading company in New York over an instant messaging system).[31] Accordingly, the Second Circuit recognized that a defendant purposefully availed herself of the privilege of conducting activities within a state when she intentionally accessed, retrieved, and disseminated confidential files stored in that state—even though those files were stored on a server located in the state rather than in a file cabinet. *See MacDermid,* 702 F.3d at 730.

Collectively, these cases recognize the realities of contemporary communications and business transactions: a defendant can engage in communications in a forum and conduct activities in a forum without ever physically entering the forum. A proper jurisdictional inquiry will not disregard a defendant's purposeful contacts with a forum simply because the defendant utilizes electronic or other means to establish its contacts. The Court affords no weight to Parex Canada's presence in Texas through technological instrumentalities and instead focuses on the fact that neither Parex Canada nor the subject matter of the transaction being negotiated were physically present in Texas; the Court's analytical approach and disposition is discordant with the weight of authority from other jurisdictions and incompatible with established United States Supreme Court precedent. I would hold Parex Canada's intentional contacts with Texas, albeit accomplished via technological means, constitute sufficient minimum contacts and are

---

**31.** *Cf. Wendt v. Horowitz,* 822 So.2d 1252, 1260 (Fla.2002) (recognizing a tort can occur within Florida under the state's long-arm statute "through the nonresident defendant's telephonic, electronic, or written communications into Florida"); *Parke–Bernet Galleries,* *Inc. v. Franklyn,* 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506, 508–09 (1970) (concluding New York courts had jurisdiction over a nonresident defendant who actively bid on items at a New York auction using a telephone line).

substantially connected to the operative facts of ERG's tortious-interference claim to enable Texas courts to exercise specific jurisdiction over Parex Canada in accordance with due process.

## B. Specific Jurisdiction Is Lacking Over Parex Bermuda

I do not reach the same conclusion regarding Parex Bermuda, however. ERG claims Texas courts have specific jurisdiction over Parex Bermuda because Parex Bermuda expressly ratified Parex Canada's jurisdictional contacts at a Parex Bermuda board meeting approving the Ramshorn acquisition. Based on deposition testimony, the board minutes reflect:

> After due consideration, having regards to the interests of Parex Resources, Inc., the ultimate parent of the company, it was resolved that the acquisition was in the best interests of the company and that the actions taken by Mr. Pinsky and Mr. Foo in connection with the negotiation of the terms of the acquisition and by Mr. Betts in executing the purchase agreement and the related transaction documents on behalf of the company be approved, ratified and confirmed in all respects.

Additionally, ERG claims Parex Bermuda implicitly ratified Parex Canada's jurisdictional contacts by accepting benefits under the SPA—i.e., purchasing the Ramshorn shares from Nabors. These contacts are immaterial if Parex Canada did not establish minimum contacts with Texas, and as a result, the Court did not consider the ratification issue.

Because I conclude Parex Canada's jurisdictional contacts were, in fact, sufficient, I consider the ratification arguments but ultimately agree with the Court that personal jurisdiction over Parex Bermuda is lacking.

### 1. Ratification of Jurisdictional Contacts

A principal can "subject himself to the jurisdiction of a foreign forum" by ratifying the acts of an agent. *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 552 (Tex.App.–Houston [14th Dist.] 2003, no pet.). "Whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct." *Id.* "The critical factor in determining whether a principal has ratified an unauthorized act by his agent is the principal's knowledge of the transaction and his actions in light of such knowledge." *Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex.1980). Along "with full knowledge of the facts of the earlier act," ratification requires "approval by act, word, or conduct ... with the intention of giving validity to the earlier act." *White v. Harrison*, 390 S.W.3d 666, 672 (Tex.App.–Dallas 2012, no pet.).

Contrary to Parex Bermuda's arguments, however, an agency relationship "is not necessary to cause the ratification to be effective." *Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 31 (Tex. App.–San Antonio 1998, pet. dism'd w.o.j.). Pre-incorporation activities also may be ratified by the later-incorporated entity and considered in assessing jurisdictional contacts. *See Rees v. Mosaic Techs., Inc.*, 742 F.2d 765, 768–69 (3d Cir.1984) ("[T]he pre-incorporation activities of a promoter may form the basis for corporate liability when they have been ratified by post-incorporation acts of the corporation."). When a non-agent's act is subsequently ratified, however, an agency relationship is not created; consequently, not all the non-agent's actions are imputed to the principal. *See Esprit*, 981 S.W.2d at 31.

Instead, ratification "will only bind the ratifier to the *specific* transaction that is ratified." *Id.* (emphasis added); *see also Bottle Rock,* 108 S.W.3d at 552 n.9 ("[A]lthough ratification of the act of a stranger will not create an agency relationship, it does bind the ratifier to the specific transaction that is ratified."). The ratifier is bound to the "entire transaction," however, and "may not, in equity, ratify those parts of the transaction which are beneficial and disavow those which are detrimental." *Land Title Co.,* 609 S.W.2d at 757. By accepting the benefits of a contract, the ratifier also becomes liable for the contractual obligations.

### 2. Parex Bermuda Did Not Ratify Parex Canada's Jurisdictional Contacts

To the extent supported by the evidence, we imply all findings necessary to support the trial court's conclusion that specific jurisdiction over Parex Bermuda is lacking. *See BMC Software,* 83 S.W.3d at 795. In arguing Parex Bermuda ratified Parex Canada's allegedly tortious communications in Texas, ERG points to Parex Bermuda's (1) purchase of the Ramshorn shares as acceptance of benefits under the April 12 SPA and (2) express approval of certain actions at an April 17, 2012 meeting. At the meeting, Parex Bermuda's board approved the purchase of Ramshorn shares for $72,635,742, the actions Parex Canada's chief financial officer and chief executive officer took in negotiating the "terms of the acquisition," and the actions of Parex Bermuda's director "in executing the purchase agreement and the related transaction documents." Even if mere approval of a transaction was sufficient to constitute ratification,[32] ERG's cited evidence would only demonstrate that Parex Bermuda had ratified the specific purchase transaction, not that Parex Bermuda had ratified Parex Canada's earlier, allegedly tortious activities in Texas. *See Esprit,* 981 S.W.2d at 31; *Bottle Rock,* 108 S.W.3d at 552 n.9.

ERG cites no evidence that Parex Bermuda ratified either Parex Canada's earlier communications disclosing the plan for Parex Colombia to buy the Ramshorn shares or the LOIs Parex Canada sent to Nabors in March 2012, which form the basis of the tortious-interference claim. *See Elec. Bankcard Sys., Inc. v. Retriever Indus., Inc.,* No. 01–01–00240–CV, 2003 WL 204717, at *7 (Tex.App.–Houston [1st Dist.] Jan. 30, 2003, no pet.) (mem.op.) ("The wrongful conduct, if any, occurred when appellants' sales representatives were persuaded to discontinue their relations with appellants."). Consequently, evidence supports the trial court's implied finding that Parex Bermuda did not ratify the alleged tortious actions of Parex Canada, and as a result, Parex Bermuda is not amenable to the jurisdiction of Texas courts.

### III. Conclusion

By adopting a perfunctory analysis that ignores the realities of complex business negotiations in a 21st century economy, the Court unduly restricts the jurisdictional reach of Texas courts and renders Texas an anachronistic jurisdictional outlier. Moreover, the Court disregards our precedent by focusing on the presumed subjective intent behind Parex Canada's conduct in Texas, rather than focusing on Parex

---

32. *See Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.,* 609 S.W.2d 754, 756 (Tex.1980) (describing the principal's knowledge as "the critical factor" in assessing ratification); *White v. Harrison,* 390 S.W.3d 666, 672 (Tex. App.–Dallas 2012, no pet.) (characterizing the elements of ratification as "(1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act").

Canada's intentional conduct in Texas—intentional conduct that gives rise to ERG's cause of action. The jurisprudence is clear: when an out-of-state defendant engages in intentional conduct in a forum state, specific jurisdiction exists over causes of action arising from the forum conduct. A tortfeasor cannot evade the jurisdiction of Texas courts by committing a tort in Texas through technological means. Accordingly, I would reverse the court of appeals' judgment in part and hold Texas courts have specific jurisdiction over Parex Canada. I agree with the Court, however, that Parex Bermuda's special appearance was properly granted and Ramshorn's special appearance was properly denied.